451 N.W.2d 377 (1990)
234 Neb. 381
In re Interest of J.L.M., D.M.M., D.J.M., J.J.M., and M.J.M., Children under 18 Years of Age.
STATE of Nebraska, Appellee,
v.
K.M., Appellant.
No. 89-341.
Supreme Court of Nebraska.
February 9, 1990.
*379 Gregory M. Thomas and Clark J. VanSkiver, of Sodoro, Daly & Sodoro, Omaha, for appellant.
Ronald L. Staskiewicz, Douglas County Atty., and Elizabeth G. Crnkovich, for appellee.
HASTINGS, C.J., and BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.
*380 SHANAHAN, Justice.
Pursuant to the Nebraska Juvenile Code, Neb.Rev.Stat. §§ 43-245 et seq. (Reissue 1988), the separate juvenile court of Douglas County terminated parental rights of K.M. in her five children because she failed to comply with a court-ordered rehabilitation program to correct conditions which led to the adjudication that K.M.'s children were juveniles within the meaning of § 43-247(3)(a) of the Nebraska Juvenile Code, and because she abandoned her children for a period in excess of 6 months immediately prior to filing of the termination petition.
K.M. appeals and among her assignments of error raises questions of first impression concerning the U.S. Indian Child Welfare Act, 25 U.S.C. §§ 1901 et seq. (1982) (ICWA) and the Nebraska Indian Child Welfare Act, Neb.Rev.Stat. §§ 43-1501 et seq. (Reissue 1988) (NICWA).

INDIAN CHILDREN WELFARE ACTS
In 1978, Congress passed the Indian Child Welfare Act, 25 U.S.C. §§ 1901 et seq., which embodies specific congressional findings:
(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;
(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.
25 U.S.C. § 1901.
ICWA contains an express congressional delcaration of policy:
The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.
25 U.S.C. § 1902.
Under ICWA, " `Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). " `Indian tribe' means any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village...." 25 U.S.C. § 1903(8).
ICWA also provides:
In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe.
25 U.S.C. § 1911(b).
In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the *381 Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.
25 U.S.C. § 1911(c).
Regarding evidence and the burden of persuasion ICWA states:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 U.S.C. § 1912(f).
Pursuant to authority delegated by the Secretary of the Interior of the United States, the Bureau of Indian Affairs promulgated "Guidelines for State Courts; Indian Child Custody Proceedings," 44 Fed. Reg. 67584 to 67595 (1979) (Guidelines).
As noted in the Guidelines, through ICWA Congress has expressed a preference for keeping Indian families together, granting deference to tribal judgment on custody matters and child placement with Indian families when Indian children have been removed from their homes. In subpart (2) of the "Policy" section of the Guidelines, there is the following provision:
In any child custody proceeding where applicable state or other federal law provides a higher standard of protection to the rights of the parent or Indian custodian than the protection accorded under the Indian Child Welfare Act, the state court shall apply the state or other federal law, provided that application of that law does not infringe any right accorded by the Indian Child Welfare Act to an Indian tribe or child.
44 Fed.Reg. at 67586.
The Guidelines further provide:
(a) When a state court has reason to believe a child in a custody proceeding is an Indian, the court shall seek verification of the child's status from either the Bureau of Indian Affairs or the child's tribe....
(b)(i) The determination by a tribe that a child is or is not a member of that tribe, is or is not eligible for membership in that tribe, or that the biological parent is or is not a member of that tribe is conclusive.
....
(c) Circumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include ...
(i) Any party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child.
Id. The "commentary" for the foregoing excerpt from the Guidelines states: "This guideline makes clear that the best source of information on whether a particular child is Indian is the tribe itself. It is the tribe's prerogative to determine membership criteria and to decide who meets those criteria." Id.
Section 43-1502 of the Nebraska Indian Child Welfare Act, enacted in 1985, expresses the purpose of the state act:
The purpose of the Nebraska Indian Child Welfare Act is to clarify state policies and procedures regarding the implementation by the State of Nebraska of the Federal Indian Child Welfare Act, 25 U.S.C. 1901 et seq. It shall be the policy of the state to cooperate fully with Indian tribes in Nebraska in order to ensure that the intent and provisions of the Federal Indian Child Welfare Act are enforced.
Sections 43-1503(4) (definitions for NICWA) and 43-1504(2) (jurisdiction and transfer of proceedings to a tribal court) are verbatim reiterations of their respective counterparts in the federal act, ICWA. Section 43-1505(6) of NICWA, as does § 1912(f) of ICWA, requires "evidence beyond a reasonable doubt" for termination of parental rights. In contrast with the "reasonable doubt" standard expressed in the Indian Child Welfare Act, the evidential standard for the burden of persuasion in termination of parental rights cases under the Nebraska Juvenile Code is "clear and convincing" evidence. In re Interest of *382 J.S., A.C., and C.S., 227 Neb. 251, 417 N.W.2d 147 (1987).

STANDARD OF REVIEW
In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the Supreme Court to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. [Citations omitted.] In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code ... termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence. [Citations omitted.] A juvenile's best interests are one of the primary considerations in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code.
In re Interest of T.C., 226 Neb. 116, 117-18, 409 N.W.2d 607, 609 (1987). See, also, In re Interest of J.S., A.C., and C.S., supra.

FACTUAL BACKGROUND
On February 6, 1984, four of K.M.'s five children were placed in foster care after police had found the children unattended in their residence. On February 16, the State filed a petition in the juvenile court and alleged that K.M.'s five childrenJ.L.M. (born June 29, 1973), D.M.M. (born March 7, 1975), D.J.M. (born March 12, 1980), J.J.M. (born August 8, 1981), and M.J.M. (born March 2, 1983)lacked proper parental care by reason of the fault or habits of their mother and, therefore, were juveniles under the Nebraska Juvenile Code. See § 43-247(3)(a) (bases for jurisdiction of a juvenile court). The State specifically alleged, inter alia, that K.M. had frequently left the children unattended for prolonged periods without adult supervision or protection and that on several occasions K.M.'s children were inappropriately attired and needed bathing. The State also alleged that K.M.'s residence was in disarray, namely, throughout the residence were dirty clothes and diapers, cigarette butts, beer cans, garbage, food particles, dirt, and human feces; dirty dishes covered the dining table and filled the sink; and a putrid odor permeated the entire residence. Further, the State alleged that K.M. suffered a dependence on alcoholic beverages, which impaired her ability to provide the necessary protection, supervision, and parental care required for the children.

ADJUDICATION UNDER THE NEBRASKA JUVENILE CODE
At the adjudication hearing on February 27, 1984, K.M., accompanied by her lawyer, appeared before the court. The guardian ad litem for K.M.'s children also appeared at the adjudication hearing. After K.M. had "stipulated" that the factual allegations in the State's petition were "true," the court found that the children were juveniles within the provision of § 43-247(3)(a) of the Nebraska Juvenile Code and ordered that the children remain in the custody of the Nebraska Department of Social Services (DSS) for foster care placement, subject to K.M.'s reasonable visitation of her children.

DISPOSITIONAL AND REVIEW HEARINGS
On April 2, 1984, K.M. appeared before the court with her attorney for a dispositional hearing. Also present were the guardian ad litem for the children, a representative of DSS, and a court service officer. Also, P.M.'s attorney appeared at the dispositional hearing. P.M. is the father of three of K.M.'s children. K.M. was living with her husband, who is not the father of any of K.M.'s children, in a one-bedroom unit at a downtown hotel with no kitchen facilities. For over 10 years K.M. had been unemployed, but at the time of the hearing derived income by supplying her blood biweekly to a blood bank. K.M.'s husband, also unemployed, supplied a blood *383 bank with his blood as a source of income. K.M. had been married to, but was divorced from, P.M., the father of K.M.'s three oldest children. Through his lawyer, P.M. indicated an intention to seek custody of his three children. The two youngest of K.M.'s children have different fathers, who never married K.M. and who are not parties to these proceedings.
At the conclusion of the dispositional hearing, the court ordered that the children remain in the custody of DSS, subject to K.M.'s reasonable visitation. The court also ordered a "home study" regarding P.M.'s residence. The court further ordered K.M. to obtain suitable and stable employment and to participate in psychological and psychiatric evaluations. Also, the court ordered that K.M. undergo a chemical dependency evaluation, adhere to any recommendations based on the evaluation, and obtain a permanent residence. The court required interim reports before a review hearing concerning the rehabilitative program ordered at the dispositional hearing.
Although notified of the review hearing set for July 30, 1984, K.M. failed to appear at the hearing. The State's evidence established that K.M. had missed several scheduled visitations with her children, that she and her husband remained unemployed, and that the couple still relied on income from selling their plasma. K.M. had completed psychological and psychiatric evaluations, but had failed to undergo a chemical dependency evaluation. K.M. and her husband were residing in a studio apartment suitable only for two adults. Meanwhile, K.M.'s children were in three separate foster homes and, with the exception of J.L.M., were doing fairly well in foster care. J.L.M., the oldest child of the five, exhibited emotional problems and, after treatment at St. Joseph Center for Mental Health, was placed in a group home.
A lawyer for the Yankton Sioux Tribe and Judge Albert Joseph, chief judge of the Yankton Sioux tribal court, appeared at the July 30 review hearing. Through Judge Joseph, the tribe indicated its intention to request that jurisdiction over K.M.'s children be transferred to the tribal court of the Yankton Sioux Tribe. See 25 U.S.C. § 1911(b) and § 43-1504(2). Apparently, the tribe and Judge Joseph believed that K.M.'s children were Indian children under the federal and state acts. However, at the time of the review hearing, no pleadings had been filed for transfer of the proceedings to the Yankton Sioux Tribe and its tribal court.
As a result of the July 30 review hearing, the court reaffirmed its previous order for DSS' custody of K.M.'s children, again ordered that K.M. maintain consistent visitation with her children, and retained its order that K.M. undergo evaluation for chemical dependency and obtain a stable source of income and suitable housing.
On August 15, the Yankton Sioux Tribe filed a petition in the juvenile court and alleged that K.M.'s children were Indian children under the federal Indian Child Welfare Act and that the tribe "accepted" jurisdiction over the children. The Yankton Sioux Tribe requested that the juvenile court transfer the proceedings to the tribe's jurisdiction pursuant to the Indian Child Welfare Act, 25 U.S.C. § 1911(b). On October 15 and through his attorney, P.M. objected to any transfer of proceedings to the Yankton Sioux Tribe.
On February 21, 1985, the juvenile court held another review hearing, at which evidence disclosed that K.M. had successfully completed a 60-day alcoholism treatment program in Omaha, but had moved to Lincoln despite an assigned social worker's admonitions against such move. Although K.M. had not visited her children since September 1984, she did eventually see her children three times in February 1985. K.M. planned to divorce her husband, from whom she had separated. At the conclusion of the review hearing, the court renewed its previous orders and further ordered K.M. to attend biweekly Alcoholics Anonymous meetings and notify the court of any significant changes in her lifestyle. Shortly after the review hearing and against the advice of DSS, K.M. moved to South Dakota to live with her mother.
*384 On November 14, 1985, K.M. filed a motion for transfer of the proceedings to the jurisdiction of the Yankton Sioux Tribe pursuant to ICWA, the federal act.
Regarding the requests to transfer jurisdiction to the Yankton Sioux Tribe, the juvenile court held a hearing on November 25, 1985, and hearings on March 3, April 30, September 16, and October 29 during 1986. Evidence at those hearings showed that K.M.'s father was a fullblooded Ponca and that her mother was one-half Yankton Sioux and one-half Caucasian. Although the method of calculating K.M.'s Indian blood degree is unclear, K.M. maintained that she was five-eighths Yankton Sioux. Each father of K.M.'s five children had no Indian blood. Although K.M. was an enrolled member of the Yankton Sioux Tribe, her children were not enrolled with the tribe. None of K.M.'s children have been raised in the traditional Indian culture of the Yankton Sioux or have ever resided on a reservation. When K.M. applied for her children's enrollment with the Yankton Sioux Tribe, the tribe rejected the applications. Judge Joseph testified that to qualify for membership in the Yankton Sioux Tribe, the applicant must be "one fourth Indian. Of that one fourth, [one] must be one eighth Yankton Sioux." Judge Joseph acknowledged that K.M.'s children must be eligible for membership in the Yankton Sioux Tribe before the tribal court could accept jurisdiction.
In May 1986, the juvenile court declined to transfer the proceedings to the Yankton Sioux Tribe. Later, after a hearing on K.M.'s motion that the federal Indian Child Welfare Act govern the proceedings, the juvenile court, on December 3, 1986, determined that
the children that are the subject of this action are in fact eligible for membership in the Yankton Sioux Tribe and the Federal Indian Child Welfare Act and its State counterpart, the Nebraska Indian Child Welfare Act should be the controlling statutory law for the hearings and proceedings involving these children.
After additional review hearings in March and July of 1987, the State, in September 1987, filed a motion to terminate K.M.'s parental rights. At the hearing in December 1987 concerning the termination motion, the State presented evidence that K.M. had failed to comply with the court-ordered program for K.M.'s rehabilitation, although DSS personnel had fully explained the plan to K.M., who understood the plan and had agreed to comply with the court's directives. In particular, K.M. failed to comply with rehabilitative recommendations received at the alcohol treatment center and did not inform the court whether she was attending Alcoholics Anonymous meetings. Also, K.M. failed to achieve the following: obtain employment; maintain contact with court service officers, who had made several attempts to contact her; attend parenting classes as recommended by a court service officer; and acquire adequate and stable housing. Although DSS made special efforts for K.M.'s visitation of her children, such as supplying bus tickets for K.M.'s travel from Lincoln to Omaha for visitation and making special arrangements with the American Indian Center of Omaha for K.M.'s child visitation at the center, the special efforts were of no avail for K.M.'s visitation of her children. Notwithstanding the order to maintain consistent visitation with her children, K.M.'s last contact with any of her children was in March 1986, when she visited her two oldest children. After March 1986, K.M. made no attempts to contact the children at all, whether through letters, telephone calls, or personal visits. A report on K.M.'s home in South Dakota reflected that K.M. was unable to provide a stable and adequate home for her children in view of her unstable financial condition, unsatisfactory housing, and unresolved alcohol problems.
On the basis of the evidence adduced at the termination hearing, the court found that reasonable efforts had been made to reunite K.M. with her family, but that return of the children to K.M. would not be in the children's best interests. Further, the court found that, "by evidence beyond a reasonable doubt," K.M. had abandoned her children for more than 6 months before the State filed its termination motion. See *385 § 43-292(1) (termination of parental rights; abandonment for 6 months before filing of petition to terminate parental rights). Also, "by evidence beyond a reasonable doubt," the court found that K.M. had failed to comply with the court-ordered rehabilitative program to correct the conditions which led to the determination that K.M.'s children were juveniles under the Nebraska Juvenile Code. See § 43-292(6) (termination of parental rights; failure to correct conditions resulting in adjudication that a child is a juvenile within § 43-247(3)(a) of the Nebraska Juvenile Code). For those reasons, on December 10, 1987, the juvenile court terminated K.M.'s parental rights in her children. K.M. appealed to this court.
During pendency of K.M.'s appeal, the State filed a motion in this court for remand on the limited question of applicability of the U.S. Indian Child Welfare Act and the Nebraska Indian Child Welfare Act, since documentation obtained showed that none of K.M.'s children was an "Indian child" within the state or federal act. Without written opinion, this court ordered a remand of the proceedings to the juvenile court for additional evidence on the issue concerning applicability of ICWA and NICWA to the proceedings. On September 7, 1988, this court's mandate was issued concerning the order for remand of proceedings in the juvenile court.
Pursuant to the remanding order and the mandate from this court, the juvenile court held a hearing on March 13, 1989. Applicable to that hearing are federal statutes, Pub.L. No. 87-629, 76 Stat. 429, enacted in 1962 and later codified as 25 U.S.C. §§ 971 to 980 (1982), which related to the "Ponca Tribe of Native Americans of Nebraska" and in part provided:
When the distribution of tribal assets in accordance with the provisions of this subchapter has been completed, the Secretary of the Interior shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to such tribe and its members has terminated. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians or Indian tribes because of their Indian status, all statutes of the United States that affect Indians or Indian tribes because of their Indian status shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction. Nothing in this subchapter, however, shall affect the status of any Indian as a citizen of the United States.
25 U.S.C. § 980.
At the March 13 hearing, the State presented documentary evidencea letter from the Yankton Sioux Tribe and a letter from the Tribal Government Services of the Bureau of Indian Affairs, Department of the Interior.
The letter from the Yankton Sioux Tribe contained a statement that "[a]ll of [K.M.'s] children are not eligible for membership [in the Yankton Sioux Tribe] because they do not meet the membership criteria" contained in the "Enrollment Ordinance of the Yankton Sioux Tribe's constitution...." Also, the letter stated that the Yankton Sioux Tribe would not consider the "Indian blood" of K.M.'s father because the Ponca Tribe had been dissolved pursuant to federal law, namely, 76 Stat. 429. Consequently, none of the former Ponca Tribe was recognized as a member of an Indian tribe. The Yankton Sioux Tribe concluded that K.M.'s "children do not meet the total Indian blood requirement" for membership in the tribe.
The letter from Tribal Government Services also referred to federal law, namely, "P.L. 87-629, 76 Stat. 429, which established termination of the Federal trust relationship to the Ponca Tribe of Native Americans of Nebraska and its members." According to the Bureau of Indian Affairs' enrollment manual: "The tribe may decide for itself that it is permissible to count the blood of a terminated Indian tribe in fulfilling requirements for membership for tribal purposes only." The letter from Tribal Government Services also stated that the Yankton Sioux Tribe "chose not to include the Ponca blood in calculating the degrees *386 of Indian blood for [K.M.'s] children, thus resulting in the rejection of their applications" for membership in the Yankton Sioux Tribe.
After the hearing on applicability of ICWA and NICWA, the court, on March 20, 1989, determined that the federal Indian Child Welfare Act and its Nebraska counterpart were inapplicable to the juvenile proceedings and left intact the previous order which terminated K.M.'s parental rights in her children.

ASSIGNMENTS OF ERROR
K.M. contends that (1) on March 20, 1989, the juvenile court lacked jurisdiction to review and alter its prior order, entered on December 3, 1986, whereby the court had determined that the Indian Child Welfare Act applied to the proceedings; (2) the juvenile court erred on March 20, 1989, in setting aside its order, entered December 3, 1986, that the Indian Child Welfare Act applied to the termination proceedings; (3) the juvenile court erred in failing to transfer the proceedings to the Yankton Sioux Tribe; (4) the juvenile court erred in terminating K.M.'s parental rights; and (5) the juvenile court erred in taking judicial notice of certain exhibits received at the hearing to terminate K.M.'s parental rights.

REMAND TO JUVENILE COURT
K.M.'s first and second assignments of error may be distilled as follows: The juvenile court erred on March 20, 1989, because the court lacked jurisdiction to review and alter its previous order of December 3, 1986, whereby the juvenile court had determined that K.M.'s children were Indian children and that the Indian Child Welfare Acts, both state and federal, applied to the termination proceedings. K.M. argues that the December 1986 order was a final, appealable order and that since the State did not appeal from the order, the juvenile court lacked jurisdiction to review the 1986 order. K.M. refers to In re Interest of L.D. et al., 224 Neb. 249, 398 N.W.2d 91 (1986), as support for her position. In In re Interest of L.D. et al., supra, we held that an adjudication under § 43-247 (Reissue 1984) of the Nebraska Juvenile Code, that is, a factual determination and adjudication concerning the various bases for a juvenile court's acquisition of jurisdiction, is an appealable order. See, also, In re Interest of L.O. and B.O., 229 Neb. 889, 429 N.W.2d 388 (1988).
Within the framework of appellate procedure, a "remand" is an appellate court's order returning a proceeding to the court from which the appeal originated for some further action in accordance with the remanding order. See, State ex rel. Norfleet v. Swafford, 184 Tenn. 340, 198 S.W.2d 1007 (1947); Mid-Ohio Liquid Fertilizers v. Lowe, 14 Ohio App.3d 36, 469 N.E.2d 1019 (1984). At a hearing or trial after remand from an appellate court, the parties stand in the same position as if there had been no prior disposition of the question, issue, or matter for which a remanded proceeding has been ordered. See, Bohmont v. Moore, 141 Neb. 91, 2 N.W.2d 599 (1942); Bliss v. Live Stock Nat. Bank, 124 Neb. 880, 248 N.W. 645 (1933). As a result of an order for remand and mandate from an appellate court, a trial court is obligated to adhere to the mandate and render judgment within the mandate's purview. See State ex rel. Hilt Truck Line v. Jensen, 218 Neb. 591, 357 N.W.2d 455 (1984).
Implicit in the order for remand and mandate was the direction that the juvenile court consider additional evidence relevant to applicability of the Indian Child Welfare Acts, both the federal act and the Nebraska act, which, in the present case, necessarily involved a determination whether any of K.M.'s children was an "Indian child" within ICWA and NICWA. Thus, the juvenile court, pursuant to this court's mandate, had jurisdiction for the hearing on March 13, 1989, and, consequently, had jurisdiction to reconsider and, if warranted by the evidence, alter its previous decision of December 3, 1986, even to the point of setting aside that previous decision and entering a new order or judgment in its place. The juvenile court's jurisdiction after remand from this court, therefore, included authority *387 to determine the applicability of the Indian Child Welfare Acts and the prerequisite finding concerning an "Indian child" for application of the acts, both ICWA and NICWA. We conclude that K.M.'s first and second assignments of error have no merit.

APPLICABILITY OF INDIAN CHILD WELFARE ACT
In her third assignment of error, K.M. contends that the juvenile court was required to transfer the proceedings to the Yankton Sioux Tribe.
Although a court, after a proper petition for transfer of proceedings, is required to transfer to an Indian tribe's jurisdiction any proceeding to terminate parental rights, see 25 U.S.C. § 1911(b) and § 43-1504(2), availability of the right to transfer is contingent on application of the Indian Child Welfare Act to the proceedings sought to be transferred. In turn, applicability of the Indian Child Welfare Act depends on whether the proceedings to be transferred involve an "Indian child" within the definition utilized in 25 U.S.C. § 1903(4) and § 43-1503(4). " `Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).
Thus, a party to a proceeding who seeks to invoke a provision of the Indian Child Welfare Act has the burden to show that the act applies in the proceedings. Matter of Juvenile Action No. JS-7359, 159 Ariz. 232, 766 P.2d 105 (App.1988); Application of Angus, 60 Or.App. 546, 655 P.2d 208 (1982). For application of the Indian Child Welfare Act to proceedings for termination of parental rights, the proceedings must involve an Indian child within the purview of the act. Matter of Juvenile Action No. JS-7359, supra; In re Smith, 46 Wash.App. 647, 731 P.2d 1149 (1987).
As pointed out in Application of Angus, supra, ICWA contains no definition of "Indian tribe." However, we agree with the Oregon court's statement, "In the absence of a Congressional definition, an Indian tribe has authority to determine its own membership." 655 P.2d at 212 (citing Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)). "Formal membership requirements differ from tribe to tribe, as do each tribe's method of keeping track of its own membership. There is thus no one method of proof of membership, but the testimony of a representative of tribal government would be probative evidence of membership." Application of Angus, supra at 655 P.2d at 212.
We now summarize the evidence on the issue whether any of K.M.'s children is an "Indian child" within the Indian Child Welfare Act.
Since none of K.M.'s children was a member of the Yankton Sioux Tribe, none of K.M.'s children was an "Indian child" within the definition of 25 U.S.C. § 1903(4)(a) and § 43-1503(1)(a). Although K.M. was a member of the Yankton Sioux Tribe, the further question is whether any of K.M.'s children was eligible for membership in the Yankton Sioux Tribe. See 25 U.S.C. § 1903(4)(b) and § 43-1503(4)(b). None dispute that, as the result of federal law, the "Ponca Tribe of Native Americans of Nebraska" has been dissolved or terminated as an Indian tribe in relation to federally recognized status as an Indian tribe eligible for services from the United States. See 25 U.S.C. § 1903(8) and § 43-1503(8). The Yankton Sioux Tribe refused to recognize the Ponca blood of K.M.'s children in computing the blood degree of the children for eligibility in membership of the tribe, decided that K.M.'s children did not meet tribal criteria for membership in the Yankton Sioux Tribe, and, hence, concluded that "all of [K.M.'s] children are not eligible for membership" in the Yankton Sioux Tribe. For those reasons, and as a result of our de novo review of the record, we find that K.M.'s children are not eligible for membership in the Yankton Sioux Tribe and, consequently, the Indian Child Welfare Act did not apply to *388 the proceedings to terminate K.M.'s parental rights.
The State urges us to uphold the juvenile court's refusal to transfer the proceedings because P.M., the father of three of K.M.'s children, objected to the requested transfer. See 25 U.S.C. § 1911(b) and § 43-1504(2). Other courts which have examined a parental objection to transfer of proceedings under the federal Indian Child Welfare Act have held that parental objection requires retention of the proceedings in a state court. See Matter of Juvenile Action No. JS-7359, 159 Ariz. 232, 766 P.2d 105 (App.1988); Matter of Welfare of R.I., 402 N.W.2d 173 (Minn.App.1987); In re Adoption of Baby Boy L., 231 Kan. 199, 643 P.2d 168 (1982); Matter of S.Z., 325 N.W.2d 53 (S.D.1982). However, inasmuch as we have concluded that the Indian Child Welfare Act is inapplicable to the present proceedings, consideration of parental objection is unnecessary.
Hence, K.M.'s third assignment of error is without merit.

TERMINATION OF K.M.'S PARENTAL RIGHTS
In her fourth assignment of error, K.M. argues that the evidence is insufficient to support termination of parental rights.
The basis for the juvenile court's judgment terminating the parental rights of K.M. is twofold: abandonment and failure to comply with a court-ordered rehabilitative program designed to eliminate or correct the conditions which led to the adjudication that J.M.'s children were juveniles within the Nebraska Juvenile Code.
The Nebraska Juvenile Code provides that parental rights may be terminated when the best interests of a child require the termination of parental rights. See § 43-292. "A juvenile's best interests are the primary considerations in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code." In re Interest of J.S., A.C., and C.S., 227 Neb. 251, 267, 417 N.W.2d 147, 158 (1987). "In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code ... termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence." In re Interest of T.C., 226 Neb. 116, 117, 409 N.W.2d 607, 609 (1987).
Among the bases for termination of parental rights, § 43-292 includes:
(1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition; [and]
(6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.
"Abandonment," for the purpose of § 43-292(1), is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child. See In re Interest of A.G.G., 230 Neb. 707, 433 N.W.2d 185 (1988). Further, we have stated that if a parent voluntarily, but unreasonably or unjustifiably, departs from the state of residence of the parent's child or children, such departure may constitute parental abandonment of the child or children and cannot be used as an excuse for noncompliance with a court-ordered plan for parental rehabilitation. See In re Interest of A.G.G., supra; In re Interest of R.A., 226 Neb. 160, 410 N.W.2d 110 (1987).
In In re Interest of L.H., 227 Neb. 857, 863, 420 N.W.2d 318, 321 (1988), we stated:
A juvenile court has the discretionary power to prescribe a reasonable plan for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code. In re Interest of T.C., 226 Neb. 116, 409 N.W.2d 607 (1987). See, also, § 43-292 (termination of parental rights; failure to correct conditions leading to adjudication). When a parent fails to make reasonable efforts to comply with the court-ordered rehabilitative *389 plan, the parent's failure presents an independent reason justifying termination of parental rights. [Citations omitted.] "When parents cannot rehabilitate themselves within a reasonable time, the best interests of a child require that a final disposition be made without delay." In re Interest of W., 217 Neb. 325, 330, 348 N.W.2d 861, 865 (1984).
Regarding parental failure to comply with a court-ordered rehabilitative program, we expressed in In re Interest of L.O. and B.O., 229 Neb. 889, 895, 429 N.W.2d 388, 392 (1988):
A parent's failure to make reasonable efforts to comply with a court-ordered plan of rehabilitation presents an independent reason justifying termination of parental rights. In re Interest of L.H., supra; In re Interest of J.S., A.C., and C.S., 227 Neb. 251, 417 N.W.2d 147 (1987). See, also, § 43-292(6) (termination of parental rights; failure to correct conditions leading to adjudication). Regarding termination of parental rights under § 43-292(6): "[I]f a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two preceding requirements prescribed by § 43-292 is evidence which is `clear and convincing.'
"Therefore, regarding parental noncompliance with a court-ordered rehabilitative plan, under § 43-292(6) as a ground for termination of parental rights, the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child." In re Interest of J.S., A.C., and C.S., supra at 267, 417 N.W.2d at 158.
K.M. devoted a substantial part of her brief to the assertion that the evidence fails to satisfy the "evidence beyond a reasonable doubt" standard for termination of parental rights under the Indian Child Welfare Act. See 25 U.S.C. § 1912(f) and § 43-1505(6). As noted, however, termination of parental rights under the Nebraska Juvenile Code requires evidence which is "clear and convincing." In re Interest of J.S., A.C., and C.S., 227 Neb. 251, 417 N.W.2d 147 (1987); In re Interest of T.C., 226 Neb. 116, 409 N.W.2d 607 (1987). Since we have concluded that the Indian Child Welfare Act is inapplicable, the appropriate evidential standard to terminate parental rights under the Nebraska Juvenile Code is evidence which is "clear and convincing." It is unnecessary to reiterate each salient item of evidence produced in the juvenile court. Suffice it to say that, from our de novo review of the record, we conclude that the evidence is clear and convincing that K.M. abandoned her children for a period of 6 months before the State filed its petition or motion for termination of K.M.'s parental rights, and the evidence is clear and convincing that K.M. failed to comply with the court-ordered rehabilitative program for K.M. The State has evidentially established that the best interests of K.M.'s children require termination of K.M.'s parental rights in her children. Thus, the trial court did not err in terminating the parental rights of K.M.

JUDICIAL NOTICE OF EXHIBITS
For her final assignment of error, K.M. argues that "the juvenile court erred in taking judicial notice of exhibits offered at earlier proceedings in this case." Brief for appellant at 29.
The Nebraska Evidence Rules contain a provision for judicial notice. See Neb. Evid.R. 201, Neb.Rev.Stat. § 27-201 (Reissue 1989). However, the Nebraska Evidence Rules are inapplicable to a proceeding to terminate parental rights under the Nebraska Juvenile Code, for, as we stated in In re Interest of J.S., A.C., and C.S., supra, 227 Neb. at 262-63, 417 N.W.2d at 155-56,
the Nebraska Juvenile Code contains explicit standards pertaining to the adduction *390 of evidence at adjudication and dispositional hearings. The standard for permissible evidence at an adjudication hearing is stated in Neb.Rev.Stat. § 43-279(1) (Cum.Supp.1986), as a part of the Nebraska Juvenile Code, which provides that admissibility of evidence shall be governed by "the customary rules of evidence in use in trials without a jury." The Nebraska Juvenile Code also provides: "Strict rules of evidence shall not be applied at any dispositional hearing." Neb.Rev.Stat. § 43-283 (Reissue 1984). Although expressed in loose legislative language, the "rules of evidence" mentioned in §§ 43-279(1) and 43-283 are the Nebraska Evidence Rules, that is, Neb. Evid.R. 101 to 1103 (Neb.Rev.Stat. §§ 27-101 to 27-1103 (Reissue 1985)). We note that, since adoption of the Nebraska Evidence Rules in 1975, this court has held that the Nebraska Evidence Rules control adduction of evidence at an adjudication hearing under the Nebraska Juvenile Code. See, In re Interest of L.D. et al., supra; In re Interest of S.S.L., 219 Neb. 911, 367 N.W.2d 710 (1985); In re Interest of Hollenbeck, 212 Neb. 253, 322 N.W.2d 635 (1982). Regarding adduction of evidence at a dispositional hearing, we have consistently held that the Nebraska Evidence Rules do not apply at a dispositional hearing, including an action to terminate parental rights, under the Nebraska Juvenile Code. See, In re Interest of J.K.B. and C.R.B., 226 Neb. 701, 414 N.W.2d 266 (1987); State v. Duran, 204 Neb. 546, 283 N.W.2d 382 (1979); State v. Bailey, 198 Neb. 604, 254 N.W.2d 404 (1977).
Also, in In re Interest of J.S., A.C., and C.S., supra, 227 Neb. at 265, 417 N.W.2d at 157, we stated:
Therefore, while the Nebraska Evidence Rules ... are not applicable in a dispositional hearing, including a hearing to terminate parental rights, the requirements of due process control a proceeding to terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. See, Neb. Const. art. I, § 3; U.S. Const. amend. XIV.
However, K.M. does not point to any due process deficiency or deprivation concerning the juvenile court's judicial notice or evidence presented at the hearing for termination of K.M.'s parental rights in her children, that is, K.M. fails to show that the juvenile court's judicial notice or any evidence deprived or violated K.M.'s due process rights.
K.M.'s fifth assignment of error is not sustained.
We affirm the juvenile court's judgments concerning inapplicability of the Indian Child Welfare Act and termination of K.M.'s parental rights in her children.
AFFIRMED.