IN RE INTEREST OF B.J.M. ET AL., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. T.M., APPELLANT.
510 N.W.2d 418

Filed May 25, 1993.    No. A-92-898.

William C. Peters for appellant.

David L. Wilson, Kimball County Attorney, for appellee.

CONNOLLY, HANNON, and MILLER-LERMAN, Judges.

MILLER-LERMAN, Judge.

T.M., the biological father of B.J.M., B.E.M., L.D.M., and J.E.M., appeals from the judgment of the county court for Kimball County, sitting as a juvenile court pursuant to Neb. Rev. Stat. § 43-245(3) (Cum. Supp. 1992), which terminated T.M.'s parental rights concerning these four children. Termination was based on the alleged abandonment of the children for at least 6 months immediately before the filing of a petition to terminate T.M.'s parental rights, pursuant to Neb. Rev. Stat. § 43-292(1) (Reissue 1988), and on the court's conclusion that termination of T.M.'s parental rights was in the children's best interests. The children's biological mother, R.B., is the subject of a separate termination proceeding and is not

involved in this appeal. For the reasons recited below, we reverse.

## STANDARD OF REVIEW

In an appeal from a judgment terminating parental rights, an appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court, but, when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another.

*In re Interest of M.P.*, 238 Neb. 857, 858, 472 N.W.2d 432, 434 (1991). Accord, *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987); *In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987).

"The unequivocal language of § 43-292 imposes two requirements before parental rights may be terminated. First, requisite evidence must establish existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two preceding requirements prescribed by § 43-292 is evidence which is 'clear and convincing.' "

*In re Interest of M.P.*, 238 Neb. at 859, 472 N.W.2d at 434 (quoting *In re Interest of J.S., A.C., and C.S., supra*).

"In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code . . . termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence." [Citations omitted.] " '[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a

fact to be proved.' "
*In re Interest of L.V.*, 240 Neb. 404, 407, 482 N.W.2d 250, 253 (1992).

## FACTS AND PROCEDURE

T.M. and R.B. were married on April 20, 1979. Four children were born during their marriage. In 1986, the family moved to Colorado. T.M. and R.B. separated on April 23, 1989, and R.B. moved with the children to Nebraska from Colorado. A divorce decree was entered by the district court for Morgan County, Colorado, on October 13, 1989. As a result of the dissolution decree, R.B. received custody of the four children and T.M. was ordered to pay child support. Apparently, visitation was at R.B.'s discretion, and the record indicates that R.B. moved at least twice and that she provided no Nebraska address to T.M.

Prior to the divorce becoming final in Colorado, the State of Nebraska filed for emergency temporary custody of the children on September 1, 1989. The children were living in Nebraska, and temporary custody was granted. See *In re Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486 (1992). A hearing was set for September 6. At the September 6 hearing, the mother, but not the father, was present. The court determined that the children were juveniles as described in Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988) because they lacked proper parental care by reason of the habits of their parents and ordered continued temporary custody of the four children to the Nebraska Department of Social Services (DSS) pursuant to Neb. Rev. Stat. § 43-254(5) (Reissue 1988).

In February 1990, the court attempted to reunite the children with their mother under the supervision of DSS. This was apparently unsuccessful. At a subsequent dispositional hearing on April 13, 1990, custody was again continued with DSS, and the children were placed in foster care. The mother was present at this hearing; the father was not. The record includes several subsequent journal entries regarding review hearings conducted in August 1990, May 1991, and August 1991, where the mother was represented by counsel. R.B.'s progress with her rehabilitation plan was reviewed, and she was ordered to

continue to comply with the rehabilitation plan, including setting up an adequate home and participating in drug testing and drug and family counseling. The children remained with a foster family. It appears from the record that R.B. did not comply with the rehabilitation plan. She was arrested in December 1991 for possession of a controlled substance.

On July 9, 1992, the State filed two separate petitions to terminate the parental rights of R.B. and T.M. As to R.B., the termination was sought on the bases of unfitness by reason of habitual use of narcotic drugs, which was seriously detrimental to the well-being of the children, and failure, after a reasonable period of time, to comply with the rehabilitation plan. As to T.M., the petition seeking termination was based on abandonment of the children for the 6 months or more immediately prior to the filing of the petition. See § 43-292(1).

The record shows that T.M. last visited with R.B. and saw the children, who were living in the Kimball area, in September 1989. During this visit, T.M. and R.B. had an altercation, and she filed assault charges against him. T.M. returned to Colorado to avoid arrest. It appears that the charges were dropped 2 years later. During 1990, T.M. was convicted of possession of crystal methamphetamine. He served approximately 5 months' jail time in 1990. Since serving his jail sentence, T.M. has been on probation. The record shows that he has complied with the conditions of probation, including drug testing. Since serving his jail sentence, T.M. has attended drug counseling at the Cimarron Counseling Center in Denver. The record shows that he attended all of the meetings during the course of 1991 and successfully completed the program, which included random drug testing. As part of his probation, he continues to be subject to random drug testing, and he has remained drug and alcohol free.

T.M. testified at the termination hearing that throughout 1990 and until the fall of 1991, his only contact with the family was through R.B. He discovered that the children were in foster care and agreed to R.B.'s request that he not come to see the children until after they were returned to her. He made no contact with the four children and paid no child support during this time. The location of the children, until April 1990 when

they were placed in foster care, was available to T.M. through his former in-laws. In 1992, the IRS intercepted a tax refund due T.M. in the amount of $65.60 and applied it to overdue child support. T.M. entered into an agreement with the State of Colorado to take $50 per pay period from T.M.'s salary to apply to temporary support which Colorado had afforded R.B. and the children. At the time of the termination hearing, payments totaling $150 had been collected in March and May 1992.

T.M. testified that in the fall of 1991, he believed the children had been in foster care long enough, so he attempted to locate his children and arrange visitation by contacting DSS. The children's caseworker asked that T.M. send her a letter so that she could verify who he was. T.M. complied by sending a notarized letter dated November 16. Because of a learning disability which makes it difficult for him to read and write effectively, the contacts with DSS were often made by T.M.'s second wife. A visitation between T.M. and the four children was arranged for December 28. T.M. bought holiday gifts in anticipation of this meeting. R.B. was arrested for possession of a controlled substance in December. DSS notified the children of the arrest and then canceled T.M.'s visitation with the children to avoid upsetting the children further. T.M. testified that he tried to have DSS set another date, but no new visitation was scheduled by DSS. At least one of the four children had expressed to a DSS social worker that he wanted to see T.M.

DSS records confirm numerous contacts from T.M. during the fall of 1991 and first quarter of 1992. T.M. and his second wife stated that all of these contacts were for the purpose of arranging supervised visitation with the children. On March 5, 1992, the guardian ad litem for the children filed a motion to limit visitation of the children by T.M., stating that R.B. had been charged with possession of a controlled substance, that T.M. had not visited the children for at least 2 years, and that parental rights would probably be terminated. On March 16, T.M. appeared before the court without counsel and opposed the motion. Later that same day, T.M. went to Bayard, Nebraska, and observed one of his sons walking home from school.

On May 1, 1992, the court granted the motion and prohibited visitation by T.M. based on "the best interests of the minor children." Three weeks later, on May 21, counsel was appointed to represent T.M. in proceedings relating to matters regarding the minor children. On May 29, T.M.'s counsel filed a motion for rehearing asking the court to reconsider its order prohibiting T.M. from visiting the four children. In the motion, T.M.'s counsel argued that the order was effectively a termination of T.M.'s parental rights and that T.M. should have been represented by counsel pursuant to Neb. Rev. Stat. § 43-279.01 (Cum. Supp. 1992). Counsel also claimed the order was not supported by the evidence and was contrary to the reunification goals of the Nebraska Juvenile Code. On July 2, a hearing on the motion for rehearing was set for July 17. There is nothing in the record to verify the disposition of the motion for rehearing, although there is argument that the motion for rehearing was denied. However, as noted above, on July 9, 1992, the State filed a petition to terminate T.M.'s parental rights, which petition was based on abandonment.

During the course of the above-noted legal filings, T.M. continued to attempt to reach his children. In May 1992, T.M. filled out a questionnaire which had been sent to him by DSS. The questionnaire, which was admitted into evidence, stated that the purpose of the review was to "discuss goals and plans for the [children's] future, and how together these plans may be carried out." The following is a portion of the DSS questionnaire and the answers provided by T.M.:

A. Current Placement and Permanency Goal

1. Do you understand and agree with the child's current living arrangement?

I understand why my children are where they are at, but I feel that my children should be with me, because of the problems their mother has had.

2. Do you understand and agree with the child's current plan?

How can I understand & agree with the children['.]s current plan, when I do not know what it is?

3. What placement and/or plan for the child do you see as appropriate? Explain[.]

I feel that the children should be placed with one parent or the other, and sense [sic] their mother cannot get her life in order, I feel the children[']s best intrest [sic] is to be with their father instead of complete strangers, where their safety, concern, fatherly intrest's [sic] and life would be normal once again.

B. What prevents the child from returning home or being placed in the most family-like permanent setting?

1. Related to the child:

Nothing prevent's [sic] the children from coming home to their fath[er] except social services, and their mother, because of what has been done by her and social services, plus whatever has been said by the mother to the legal authority's [sic].

. . . .

D. Do you wish to be included in the planning for the next permanent plan review in six months?

<u>YES... Most Definitely..</u> I would like a letter ahead of time notifing [sic] me in advance of any hearings[,] court dates[,] proceedings[,] etc.

E. Other comments or additional information that will contribute to the planning. (Attach reports if applicable.)

I feel that the courts were wrong, when they can turn right around after [R.B's] drug bust, and allow her to see the kids and have visitation again. (In [Bayard.)]

Then after all still continue to turn me down. When I love my children as much as their mother say's [sic] she does. But for some reason she cannot seem to turn her life around to give to the children, and do what is right for their well being.

I being the father of the said children feel that I have never been given a fair chance with my children, and often wonder when I am going to be given a chance with them which I have never had. . . .

It has always been their mother that has been given chance after chance, and never has it been considered to give their father a chance. I would li[ke] to know just what the true reason is on why I have never been given this chance.

I have turned my life around to better myself so I had a chance to recieve [sic] the chances that [R.B.] has gotten, but for some reason I am still refuse[d] all visitation of the children.

Thank You Very Much.

[T.M.]

On September 4, 1992, the hearing was held on the State's petition to terminate T.M.'s parental rights. The foregoing background facts were established. T.M. asserted that he had not been notified of the original September 6, 1989, hearing, as a result of which the children had been adjudicated to be juveniles within the provisions of § 43-247(3)(a) and placed in foster care.

R.B., her parents, and Debra Greenwood, the children's caseworker, testified for the State. T.M.'s parents and his second wife appeared on his behalf. T.M. testified on his own behalf. Several documents are presented in the record, including the petition to terminate T.M.'s parental rights, journal entries for proceedings where T.M. was not present or represented, and journal entries pertaining to R.B.'s review hearings. Additionally, letters from T.M.'s employer, a counselor, and a probation officer, which letters were all favorable to T.M.; the notarized letter from T.M. to Greenwood, dated November 16, 1991, seeking information about the four children; and the DSS questionnaire quoted above were admitted. No counselors, psychologists, or other health care professionals appeared with any information regarding the children's mental well-being or best interests. The court took the matter under advisement and on September 15, 1992, concluded by clear and convincing evidence that T.M. had abandoned the children and that termination was in the children's best interests. This appeal followed.

## ANALYSIS

On appeal, T.M. claims that he was denied due process in connection with the juvenile court proceedings in general and the procedures associated with the termination of his parental rights in particular. T.M. also claims that abandonment was not proven by clear and convincing evidence. The State argues that

T.M. was accorded due process throughout the juvenile court proceedings and that the evidence supports the conclusion of abandonment.

T.M. claims that he was unaware of the original proceedings on September 6, 1989, and the order entered September 12, in which the children were adjudicated to be juveniles within the provisions of § 43-247(3)(a). R.B. appeared at the adjudication hearing, waived her right to counsel, and admitted the allegations in the petition. This court notes that T.M. is the biological father of the four children, that a divorce proceeding was pending in Colorado on the date of the hearing in Nebraska and on the date the children were adjudicated, and that T.M. possessed all of the constitutionally protected rights of a parent at that time. Yet, pursuant to the record before this court, he was denied notice of the hearing. See *In re Interest of L. V.*, 240 Neb. 404, 482 N.W.2d 250 (1992) (recognizing that non-custodial parents have a fundamental liberty interest in the care, custody, and management of their children).

The juvenile code requires that notice of an adjudication hearing shall be given "in the manner provided for service of a summons in a civil action." Neb. Rev. Stat. § 43-268(2) (Reissue 1988). Neb. Rev. Stat. § 25-508.01 (Reissue 1989) requires that an individual be served personally, at his or her residence, or by certified mail. Case law states that after a reasonably diligent search, notice by publication may be made if the individual cannot be located. *In re Interest of A. W.*, 224 Neb. 764, 401 N.W.2d 477 (1987). In the case at bar, there is nothing in the record reflecting how notice was served or whether or not T.M. received notice of the adjudication hearing. The only address on the petition was R.B.'s Nebraska address. T.M. had never resided at this address. There is nothing in the record indicating any attempt by the State to locate T.M. or discover his true address. Without proper notice, the judgment is void and may be collaterally impeached. *State v. Roth*, 158 Neb. 789, 64 N.W.2d 799 (1954). T.M. was denied due process in the proceeding of September 6, 1989, where custody of his children was given to DSS. Furthermore, on the record before this court, it must be questioned whether the Nebraska court had proper jurisdiction for the adjudication hearing, since a divorce

was pending in Colorado. See *In re Interest of L. W.*, 241 Neb. 84, 486 N.W.2d 486 (1992).

T.M. next claims that he was denied due process in connection with the advent of the termination proceedings. Specifically, T.M. claims that the State's motion to limit visitation, filed on March 5, 1992, was effectively an effort to terminate his parental rights and that he was entitled to be represented by counsel at the proceedings involving consideration of the motion. The record shows that T.M. appeared without counsel and that the motion was granted on May 1. Counsel was not appointed for T.M. until May 21. Shortly after appointment, T.M.'s counsel asked that the motion to limit visitation be reheard. The request for a rehearing was apparently denied, and no appeal was taken.

Finally, T.M. attacks the conduct and outcome of the termination hearing, claiming that he was denied due process and that the evidence of abandonment was insufficient. The State argues that T.M. was not denied due process because he was represented prior to and at the termination hearing and that he had the opportunity to resist the proposed termination of parental rights. The State further argues that the evidence of abandonment by T.M. was clear and convincing.

The petition for termination of T.M.'s parental rights was based solely on abandonment. See § 43-292(1). It is undisputed that T.M. was represented by counsel and had an opportunity to prepare and present evidence. The petition alleged that T.M. had abandoned the children for 6 months or more immediately prior to the filing of the petition on July 9, 1992. As noted above, the Nebraska Supreme Court has stated:

" 'The unequivocal language of § 43-292 imposes two requirements before parental rights may be terminated. First, requisite evidence must establish existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two

preceding requirements prescribed by § 43-292 is evidence which is "clear and convincing." ' "

*In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 702, 484 N.W.2d 68, 69 (1992) (quoting *In re Interest of M.P.*, 238 Neb. 857, 472 N.W.2d 432 (1991)).

It has also been stated that

> [s]ection 43-292(1) provides that the court may terminate parental rights when the parent has "abandoned the juvenile for six months or more immediately prior to the filing of the petition" to terminate parental rights. " 'Abandonment,' for the purpose of § 43-292(1), is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and opportunity for the display of parental affection for the child." *In re Interest of J.L.M. et al.*, 234 Neb. 381, 398, 451 N.W.2d 377, 388 (1990). Accord, *In re Interest of C.A.*, 235 Neb. 893, 457 N.W.2d 822 (1990); *In re Interest of A.G.G.*, 230 Neb. 707, 433 N.W.2d 185 (1988). "The question of abandonment is largely one of intent, to be determined in each case from all of the facts and circumstances."

*In re Interest of L.V.*, 240 Neb. 404, 419, 482 N.W.2d 250, 260 (1992).

The Nebraska Supreme Court has stated that parents have a positive duty to exhibit a continued interest in their children and a genuine effort to associate and maintain the lines of communication with those children. *In re Interest of C.K., L.K., and G.K., supra.*

From our de novo review, we find that T.M. was absent from the children's lives from September 1989 until the fall of 1991. During this period of time, T.M. lived in Colorado and served jail time. During this same period of time, the children's mother interacted with the Nebraska court system and was ordered to comply with a rehabilitation plan. The children were placed in foster care. T.M. explains his lack of involvement on an external locus of control, purporting to blame others for his lack of contact with the children. This court rejects his explanation and concludes that it is fair to characterize his

absence during at least some of this time period as voluntary. However, no proceedings to terminate T.M.'s parental rights were brought during this time.

In the fall of 1991, T.M. came back on the screen. T.M.'s renewed interest in the children coincided with successful completion of a drug-counseling program and violation-free probation. At the hearing, a letter from the Cimarron Counseling Center, dated December 26, 1991, was received in evidence, which letter stated in part that T.M.'s participation and progress was "excellent" and that all of his drug tests over the prior year were drug and alcohol free. Also, an approving letter from T.M.'s probation officer was received in evidence. The letter said in part that T.M. had taken a good look at his past mistakes and had now become a "useful and productive citizen." Finally, a letter was received in evidence showing that T.M. had been employed at Guerdon Homes, Inc., during June and July 1992. The evidence shows that T.M. has remarried and has taken an active positive interest in his second wife's daughter.

According to the record, in the fall of 1991, T.M. and his second wife undertook to reestablish ties with the four children by working with DSS. A DSS caseworker stated that she asked T.M. to send a letter to verify his identity and intentions. T.M. complied by sending a notarized letter dated November 16. T.M. thereafter worked with DSS to set up a visitation with the children. The visitation set for December 28 was canceled by DSS because DSS concluded that the reintroduction of T.M. into the children's lives would be unwise at that time and on its own accord refused to reschedule any visitation. T.M. persisted in his efforts to arrange a visitation during the first quarter of 1992 through DSS. These efforts were met with a motion to limit visitation filed in March 1992 by the children's guardian ad litem. T.M. persisted in his efforts and responded to a DSS questionnaire in May 1992. Additionally, T.M. moved to Nebraska and acquired a Nebraska probation officer, and evidence in the record reflects that he was gainfully employed in June and July 1992 by a Gering, Nebraska, employer. However, the trial court had already granted the motion forbidding visitation thereby precluding contact by T.M. with his children

after May 1, 1992.

This court has conducted a de novo review of the facts and circumstances of this entire case. Based on the record before us, we conclude that at the time of the termination hearing, T.M. and the children were all residents of Nebraska and that jurisdiction, pursuant to the Nebraska Child Custody Jurisdiction Act, Neb. Rev. Stat. § 43-1201 et seq. (Reissue 1988), appears to be proper. We further conclude that T.M. has demonstrated that his intent during the requisite period was to participate in his children's lives and that his efforts were genuine. See *In re Adoption of Simonton*, 211 Neb. 777, 320 N.W.2d 449 (1982). We find that the record shows that T.M.'s failure to connect with his children during the requisite period was due to just cause and excuse and not indifference. See *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990). Rather than clear and convincing evidence of abandonment, we find that the record shows a systemically created series of impediments which prevented T.M.'s interest in the care and welfare of his children from successfully maturing into an acceptable relationship. During the 6 months immediately preceding the filing of the petition, he was kept at bay, first, by DSS and, then, by court order. Because we do not find clear and convincing evidence of abandonment for a period of at least 6 months immediately before the filing of the petition and because T.M. was denied due process in the juvenile adjudication proceedings, we reverse the judgment of the court terminating T.M.'s parental rights.

In view of the above finding, we have not fully evaluated the best interests of the children, which is the primary consideration in a termination of parental rights case. See *In re Interest of J.H. et al.*, 233 Neb. 338, 445 N.W.2d 599 (1989). Our de novo review of the record of the termination hearing reveals that the evidence is sparse, and at best, conclusory regarding the children's best interests. Further proceedings, if any, would profit from the addition of information regarding the psychological well-being of the children for the evaluation of the fact finder.

REVERSED.