2009 ME 85

**In re BABY DUNCAN.**

Supreme Judicial Court of Maine.

Submitted on Briefs: April 30, 2009.

Decided: Aug. 6, 2009.

Randy G. Day, Esq., Garland, ME, for the father.

Kelly Bunch, Esq., Judith Berry, Esq., Law Offices of Judith Berry, Gorham, ME, for the adoptive parents.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, and MEAD, JJ.

CLIFFORD, J.

[¶ 1] The father appeals from a judgment entered in the Penobscot County Probate Court (*Woodcock, J.*) denying his petition to establish parental rights over Baby Duncan, a child he fathered and who is the subject of a petition for adoption. In order to prevent the adoption of the child, to which the mother consents, the father, whose paternity had not been legally established, is required pursuant to 18–A M.R.S. § 9–201(i) (2008) to establish that he is the child's biological father, demonstrate his willingness and ability to parent the child, and show that establishing his parental rights is in the child's best interest. The father contends that the court erroneously determined that: (*l*)he is not able to protect the child from jeopardy, (2) he failed to show that he did not abandon the child, (3) he is not able to take responsibility for the child, and (4) it is in the child's best interest for the court to deny the father's petition to establish parental rights. We are unpersuaded by the father's contentions and we affirm the judgment.

## I. BACKGROUND

[¶ 2] The mother gave birth to Baby Duncan in California on October 30, 2007. On November 1, 2007, the adoptive parents filed a petition for adoption in the Penobscot County Probate Court. The mother named the father in her consent to the adoption, and in an affidavit of paternity. The child began residing with the adoptive parents on November 2, 2007, and has lived with them in Orrington since November 12, 2007.

[¶ 3] The father was served with notice of the adoption on January 18, 2008, after which he filed a petition pursuant to 18–A M.R.S. § 9–201 (2008) to establish parental rights, and a petition to quash the adoption proceedings. The court appointed a guardian ad litem (GAL), and a hearing on the father's petitions was held on August 29, 2008. The father participated in the hearing by telephone.

[¶ 4] The father testified that he is currently incarcerated in Texas, where he is serving a twenty-year sentence for aggravated robbery and retaliation. The father acknowledges that, for at least the next eight years, after which time he will be eligible for parole, he is unable to financially support the child, participate in the child's guidance or education, or be personally present in the child's life.

[¶ 5] The father testified that if the court were to grant him parental rights, he would turn the child over to his parents, who, according to the father, are willing and able to provide for the child. Upon his release from prison, the father would bring the child to his own home. The father's parents did not testify at the hearing, and aside from his own testimony, the

father did not present any evidence as to his parents' willingness and ability to provide for the child.

[¶ 6] At the time of the hearing, the child had been living with the adoptive parents for ten months. There was evidence, consistent with the GAL report, that the adoptive parents provide the child with a healthy, loving, and stable environment, and meet the child's physical and emotional needs. The father has made no attempt to contact the child, has not sought pictures or information about the child, and has provided no financial support for the child. The GAL recommended against granting the father's petition to establish parental rights, and recommended that the adoption proceed.

[¶ 7] Following the hearing, the court made the following findings of fact. Although the father is the child's biological father, and "might be willing" to protect the child from jeopardy, it is not reasonable to conclude that he is able to do so, despite his plans to have his parents care for the child. Because the father has made no attempt to contact the child, nor to provide any financial support for the child, despite his knowledge of the adoption proceedings, he failed to establish that he did not abandon the child. Because the father cannot provide financial support for the child, nor meet the child's day-to-day needs, the father is not able to take responsibility for the child. Finally, because the adoptive parents have established a strong emotional relationship with the child, "have the capacity and disposition to educate and give guidance to this child," have provided the child with her needs since birth, and intend to remain active in the community, all of which the father cannot do at this time, it is not in the child's best interest for the court to grant the father's petition to establish parental rights. The court denied the father's petition to establish parental rights, and the father filed this appeal.[1]

## II. DISCUSSION

[¶ 8] When a mother consents to the adoption of her child, the alleged biological father cannot prevent the adoption unless his parental rights have been legally established. *See Adoption of G.*, 529 A.2d 809, 813 (Me.1987) (holding that "[i]t is only when a natural father acquires parental rights ... that he acquires a veto power over the adoption of the child"). To establish parental rights, the alleged biological father, known as the putative father, *see* 18–A M.R.S. § 9–102(j) (2008), must prove that: (1) he is the biological father of the child, (2) he is willing and able to protect the child from jeopardy, (3) he has not abandoned the child, (4) he is willing and able to take responsibility for the child, and (5) the establishment of parental rights is in the child's best interest. 18–A M.R.S. § 9–201(i). If the court finds that the putative father has not met any one of these requirements, the court "shall rule that the putative father has no parental rights and that only the biological mother of the child need consent to adoption."[2] 18–A M.R.S. § 9–201(j); *see also* 18–A M.R.S. § 9–302(b)(*l*)(iii) (2008). In reviewing a judgment on a petition to establish parental rights pursuant to 18–A M.R.S. § 9–201, we review the required factfinding pursuant to a clear error stan-

---

1. The court also denied the father's petition to quash the adoption proceedings. The father did not appeal the court's order denying his petition to quash the adoption proceedings.

2. Although the court needs to find that only one of the statute's requirements has not been met in order to rule that parental rights have not been established, 18–A M.R.S. § 9–201(i) (2008), the court in this case found that multiple factors were not met, and we review each finding separately.

dard.[3] *In re John Joseph V.*, 500 A.2d 628, 629 (Me.1985). "A factual determination is clearly erroneous only when there is no competent evidence in the record to support it." *Guardianship of Boyle*, 674 A.2d 912, 913 (Me.1996).

**A. Whether the Father is Able to Protect the Child from Jeopardy**

[¶ 9] Jeopardy is defined as:

[S]erious abuse or neglect, as evidenced by:

A. Serious harm or threat of serious harm;

B. Deprivation of adequate food, clothing, shelter, supervision or care or education when the child is at least 7 years of age and has not completed grade 6;

B–1. Deprivation of necessary health care when the deprivation places the child in danger of serious harm;

C. Abandonment of the child or absence of any person responsible for the child, which creates a threat of serious harm; or

D. The end of voluntary placement, when the imminent return of the child to his custodian causes a threat of serious harm.

22 M.R.S. § 4002(6) (2008); *see also Adoption of G.*, 529 A.2d at 811–12 (stating that there is no need to assign different meanings to terms in termination of parental rights and establishment of parental rights contexts). Being unable to protect a child

from jeopardy is synonymous with being incapable of doing so. *See In re John Joseph V.*, 500 A.2d at 630. A parent is incapable of protecting its child from jeopardy if, "for whatever reason," the parent cannot "take responsibility for his or her child." *Id.*

[¶ 10] The evidence demonstrates that there is a substantial likelihood that the father will be incarcerated for at least eight years, and possibly for as long as twenty years. The father therefore cannot personally ensure that the child will not be subject to serious abuse or neglect. Although the father testified that his parents are willing to care for the child, the lack of evidence presented regarding the child-rearing capabilities of the father's parents, or their willingness to provide any care for the child, supports the court's finding that this proposed arrangement does not fulfill the requirement of 18–A M.R.S. § 9–201(i). Thus, the evidence supports the court's finding that the father is unable to protect the child from jeopardy.

**B. Whether the Father Abandoned the Child**

[¶ 11] Abandonment is defined as:

[A]ny conduct on the part of the parent showing an intent to forego parental duties or relinquish parental claims. The intent may be evidenced by:

A. Failure, for a period of at least 6 months, to communicate meaningfully with the child;

---

**3.** We have previously held that in reviewing a petition to establish paternal rights, the standard of review is "whether the factfinder could reasonably have been persuaded that the required factual findings were proved to be highly probable." *Adoption of G.*, 529 A.2d 809, 811 (Me.1987). Our determination in *Adoption of G.*, however, was based upon a previous version of the statute, which required the court to determine that the putative father had not established parental rights if "clear and convincing evidence" existed

demonstrating that the father did not meet certain of the statute's requirements. *See* 19 M.R.S.A. § 532–C (1993). Title 19 M.R.S.A. § 532–C was repealed and replaced by P.L. 1993, ch. 686, § 3, which was repealed and replaced by P.L.1995, ch. 694, § B–1 (effective Oct. 1, 1997) (codified at 18–A M.R.S. § 9–201 (2008)). The current version of the statute eliminated the "clear and convincing evidence" language. 18–A M.R.S. § 9–201(i) (2008).

**B.** Failure, for a period of at least 6 months, to maintain regular visitation with the child;

**C.** Failure to participate in any plan or program designed to reunite the parent with the child;

**D.** Deserting the child without affording means of identifying the child and his parent or custodian;

**E.** Failure to respond to notice of child protective proceedings; or

**F.** Any other conduct indicating an intent to forego parental duties or relinquish parental claims.

22 M.R.S. § 4002(1–A) (2008). Although incarceration does not, by itself, constitute abandonment, the separation caused by incarceration creates "the necessity for an even greater effort to foster a nurturing relationship." *In re Daniel C.*, 480 A.2d 766, 768–69 (Me.1984); *see also In re Shannon R.*, 461 A.2d 707, 714 (Me.1983) (holding that "a mere flicker of interest" in a child by a parent is not sufficient to preclude a finding of abandonment) (quotation marks omitted).

[¶ 12] In this case, the father has not made any effort to foster a nurturing relationship with the child, and has not shown more than "a mere flicker of interest" in the child. *See In re Shannon R.*, 461 A.2d at 714, Although the father had knowledge of the petition for adoption seven months prior to the hearing, he did not seek to communicate with the child or the adoptive parents, to engage his own family and have the child introduced to his family, or to obtain photographs of the child. Nor has he provided the child with any type of financial support. In fact, the father's only involvement in the child's life has been the initiation of these proceedings. The evidence supports the court's finding

that the father did not establish that he did not abandon the child.

**C.** Whether the Father is Able to Take Responsibility for the Child

[¶ 13] In child protection cases, a "[p]erson responsible for the child" is defined as "a person with responsibility for the child's health or welfare...." 22 M.R.S. § 4002(9) (2008). The evidence supports the court's finding that the father is unable to take responsibility for the child because, for at least eight years, the father cannot meet the child's day-to-day needs and cannot ensure that the child is safe and healthy. The father cannot live with the child, be personally present in the child's life, nor provide for the child financially, and he presented no real evidence that his parents could take responsibility for the child in his place.

**D.** The Child's Best Interests

[¶ 14] The statute governing the establishment of paternal rights permits the denial of parental rights to a putative father based solely on a consideration of the child's best interests. 18–A M.R.S. § 9–201(i); [4] *see also Adoption of G.*, 529 A.2d at 812. We review the Probate Court's determination of the child's best interests for an abuse of discretion. *See Adoption of G.*, 529 A.2d at 812.

[¶ 15] The court must consider the child's best interests in proceedings to establish paternal rights, and in adoption proceedings. 18–A M.R.S. §§ 9–201(i), 9–308(b) (2008). In considering the child's best interests, the court shall evaluate the following factors in order to provide the child a permanent home at the earliest possible date:

---

**4.** Because the father has failed to demonstrate that he can meet other parental fitness criteria set out in section 9–201(i), we need not determine here whether this statute would pass constitutional muster.

(1) The love, affection and other emotional ties existing between the adoptee and the adopting person or persons, the biological parents or biological parent or the putative father;

(2) The capacity and disposition of the adopting person or persons, the biological parent or biological parents or the putative father to educate and give the adoptee love, affection and guidance and to meet the needs of the adoptee . . . .; and

(3) The capacity and disposition of the adopting person or persons, the biological parent or biological parents or the putative father to provide the adoptee with food, clothing and other material needs, education, permanence and medical care or other remedial care recognized and permitted in place of medical care under the laws of this State.

18–AM.R.S. § 9–308(b).

[¶ 16] There is more than sufficient evidence to support the court's determination that the denial of the father's petition to establish parental rights is in the child's best interest. In determining the child's best interest, the court considered all of the relevant factors, including the strong emotional bond between the child and the adoptive parents, with whom the child has lived since she was four days old. On the other hand, the child has never met the father, and the father has not sought contact with the child or the adoptive parents, despite his having knowledge of the petition for adoption for seven months prior to the hearing. The court also properly considered the father's inability to educate, guide, and meet the child's emotional and financial needs, as a result of his being incarcerated for at least the next eight years. The adoptive parents, on the other hand, demonstrated that they have provided and will continue to provide the child with a healthy and loving environment, and that they are able to meet the child's needs emotionally and financially. Moreover, the adoptive parents, who are in a stable marriage and rooted in their community, will provide a sense of permanency for the child, whereas the father plans to remove the child from the only home she has ever known, place her in his parents' custody, and remove her from his parents' home to live with him upon his release from prison some years down the road.[5]

[¶ 17] The court properly denied the father's petition to establish parental rights.

The entry is:

Judgment affirmed.

---

5. In considering the child's best interests, the court did not abuse its discretion in declining to give any weight to the father's contention that the establishment of his parental rights would prevent future emotional damage to the child by allowing her to know her birth family. Although the child may benefit from a relationship with her birth family, the record contains no evidence that the child will be harmed if the adoptive parents raise her, and there is evidence that the child would be harmed if she were removed from the adoptive parents' home.