2010 ME 58

**ADOPTION OF LILY T.**

Supreme Judicial Court of Maine.

Submitted on Briefs: May 27, 2010.
Decided: July 1, 2010.

Caleb J. Gannon, Esq., Andrews Bruce Campbell, P.A., Bowdoinham, ME, for the father.

Linda K. Yarmosh, Esq., Boothbay, ME, for petitioners.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, GORMAN, and JABAR, JJ.

ALEXANDER, J.:

[¶ 1]  The father of Lily T. appeals from a judgment of the Lincoln County Probate Court (*Berry, J.*) terminating his parental rights to Lily at the request of Lily's mother in order to allow Lily's stepfather to adopt her.  The father argues that the Probate Court erred in finding, by clear and convincing evidence, that: (1) he is an unfit parent on the alternative statutory grounds of (i) abandonment, and (ii) unwill-

ingness or inability to. take responsibility for Lily in a time reasonably calculated to meet her needs, primarily because he was prohibited from contacting Lily pursuant to a protection from abuse order;  and (2) termination of his parental rights is in the child's best interest.  We affirm the judgment.

## I.  CASE HISTORY

[¶ 2]  The case history that follows is supported by evidence in the record.

[¶ 3]  In 2002, the mother, then eighteen years old, was living with the father in California.  The father abused drugs and verbally and physically abused and threatened the mother.  On one occasion, the father bit the mother in the face when she thought he was going to kiss her.  In December 2002, the mother, then pregnant, moved to Maine to live with her parents.

[¶ 4]  Lily was born in Maine on July 24, 2003.  At that time, the father "constantly" called the mother, threatening her, but never asking about Lily. Because of the father's behavior, the mother requested a protection from abuse order, on behalf of herself and Lily, in October 2003.  The District Court (West Bath, *Field, J.*) granted a temporary order of protection.

[¶ 5]  The mother's complaint requested that the father's contact rights with Lily be discussed at the hearing, but did not request that the father be denied visitation rights.  The father, who was living in Michigan at the time, received a copy of the temporary order and a notice to appear at the hearing on the request for a final protection from abuse order.  The father did not appear at the hearing on the final order.  The mother was granted a final order for protection from abuse on December 10, 2003, effective for two years. The order prohibited the father from having contact with both the mother and Lily.[1]

_____

1.  The full record from the protection from abuse proceeding is not before us on this

[¶ 6] The father was also ordered to pay child support, for which an income withholding order was entered. At some point in 2003, the father joined the Army. The Department of Health and Human Services garnished the father's military pay and income tax refunds to reimburse the State for child support payments. The father has not paid child support beyond these withheld payments.

[¶ 7] The father made no effort to contest the entry of the first protection from abuse order or to later modify it to allow him to contact or visit with the child. Despite the mother's desire to keep her whereabouts confidential, the father contacted the mother several times while the protection from abuse order was in effect, calling and sending her letters directly, and contacting her indirectly through calls to her family and friends.[2] In his contacts, the father did not ask about or mention Lily, other than to discuss the logistics of making mandated child support payments.

[¶ 8] In December 2005, on the mother's motion, the order for protection from abuse was extended another two years, to December 15, 2007. The father was personally served in Texas with both the motion to extend the order and the subsequent extended order for protection from abuse. The father had the mother's attorney's contact information, but again he did nothing to object to the extension of the protection from abuse order or to seek to modify the order to allow him to contact the child.

[¶ 9] In late 2005, the mother filed a complaint for determination of parental rights and responsibilities. The father was served in Texas with a summons to appear for the hearing and instructions on

how to oppose the action. The mother's attorney also sent a letter to the father explaining the mother's action, which provided the father with the mother's attorney's contact information. Although the father was given notice of the action, he did not appear, defend, or otherwise respond to the parental rights action.

[¶ 10] On February 23, 2006, the court (Kidman, M.) entered a judgment finding that the father is Lily's biological and legal father and awarding the mother sole parental rights and responsibilities. The order provided that the father "shall have no rights of contact with Lily." The order also stated that no child support was ordered at that time because the court had no jurisdiction over child support. The mother stated in the Probate Court proceeding that she had not sought child support from the father because she did not want him to know where she lived.

[¶ 11] The father was discharged from the Army in early 2006 because of his continuing drug addiction, despite his participation in the military's drug rehabilitation program.

[¶ 12] In 2007, the mother married the stepfather, whom she met in 2004. The mother and the stepfather have a daughter together who is three years younger than Lily. The stepfather has acted as a father to Lily since she was less than one year old, and she calls him "Dad." The evidence indicates that Lily is attached to her current family consisting of her mother, her stepfather, and sister, and is not attached to the father. The child is thriving with her current family, who cares for all of her medical, educational, financial, material, and emotional needs. The child has little

---

appeal.

2. Despite the father's argument that the mother precluded him from finding her and the child, the father noted in one letter to her that

he "lost [the mother's] address, I don't know how I misplaced it," and that he, in fact, was concealing his then current address from the mother as "a precautionary step."

or no awareness of her biological father. The mother raised the topic of the father with the child once, telling the child that she had "another daddy," but discontinued the conversation because it confused the child.

[¶ 13] The father has never seen (personally or in a photo), communicated with, or visited Lily at any time during her life. He has never sent her a card or gift and, when communicating with the mother, has never asked about the child's school or activities. In 2005, apparently at the request of the State, the father asked for Lily's social security number for the purpose of obtaining healthcare support for Lily, but there is no evidence that he ever obtained healthcare support for her.

[¶ 14] The father testified at the Probate Court termination hearing in October 2009 that, in the years since the protection from abuse order expired, "every time I tried to get in contact there would be a restriction order. So I chose myself I would stay away until a situation like this came up, because every time I did there would be a restraining order and I just didn't want to deal with it. And at the time I didn't know where she was at." He also stated that, "[a]fter March 2007, I was going to stay away permanently until the situation like this arose this year."

[¶ 15] Following the termination hearing, the Probate Court entered a judgment terminating the father's parental rights to Lily, concluding that: (1) he is unfit on the alternate grounds that he abandoned the child and that he has been unwilling or unable to take responsibility for the child within a time reasonably calculated to meet her needs; and (2) termination of his parental rights is in the child's best interest. The Probate Court found that the father "should have done more, sooner to establish even the most elemental relationship with his daughter," and that, other than traveling from California to Maine for the termination hearing, the father had done nothing during his daughter's life to show any interest in, or to take responsibility for, her. The court also found that the father had never attempted to communicate with the child at any time, and that the four-year period during which he was precluded from contacting her due to the protection from abuse order was the result of his own actions in abusing the mother. The court also noted, as the evidence had indicated, that the father had violated the protection from abuse order by contacting the mother.

[¶ 16] The court concluded that the father's drug addiction and domestic violence caused the break-up with the mother, that the only evidence of his recovery from drug addiction was his testimony, and that there was no credible evidence that he had addressed his issues with domestic violence. The court indicated that it thought, as to the issue of the best interest of the child analysis, the father's testimony lacked credibility because it corresponded so closely with our discussion in *In re Brandon D.*, 2004 ME 98, 854 A.2d 228.

[¶ 17] Although the court did not make findings in this regard, the father testified that he had been drug-free for two and one-half years, he attends AA or NA once every six months, and he was employed at the time of the hearing. He also testified that he lives with his fiancee and that they were expecting a child together. He stated that he is interested now in seeking court-approved contact with Lily and wants to pay child support. Additionally, although there is evidence that the father remained in contact with his own parents, the mother testified that the father's parents have had no contact or relationship with Lily, though the mother exchanged e-mails once or twice with the father's mother after she moved to Maine and was pregnant with Lily.

[¶ 18] After entry of the termination order, the father brought this appeal.

## II. LEGAL ANALYSIS

### A. Abandonment

[¶ 19] The father argues that the record does not contain clear and convincing evidence that he abandoned the child, within the meaning of 22 M.R.S. §§ 4002(1–A), 4055(1)(B)(2)(b)(iii) (2009), because: (1) he asserts, the mother "purposefully kept [him] from being able to successfully discover his child's whereabouts"; (2) he was prohibited from contacting the child from December 2003 through December 2007 due to the protection from abuse order; and (3) he was in the military for some of the time during which the protection from abuse order was in effect. The father also argues that it would be unconstitutional to permit his compliance with the protection from abuse orders, entered pursuant to a preponderance of the evidence standard, to constitute evidence of his abandoning the child and serve as a ground for termination of his parental rights, for which the clear and convincing evidence standard must be applied. Finally, the father argues that the court erred in considering his decision not to defend the action that established his paternity as evidence of abandonment, and that his traveling to Maine from California for the termination hearing demonstrated more than a "mere flicker of interest" in the child.

[¶ 20] The first of the two grounds upon which the Probate Court found the father to be an unfit parent was that he had abandoned the child. See 22 M.R.S. §§ 4002(1–A), 4055(1)(B)(2)(b)(iii). The same standards for finding parental unfitness apply when a private party files a petition to terminate parental rights as when the Department of Health and Human Services files a petition to terminate.

*In re Jacob B.,* 2008 ME 168, ¶ 13, 959 A.2d 734, 737.

[¶ 21] We have not addressed termination of parental rights on the grounds of abandonment when the parent at issue was prohibited from contacting the child for a period of time pursuant to court orders. This situation is in some ways analogous, however, to situations when an incarcerated parent is deemed to have abandoned his or her child. As with a parent's long-term incarceration, a parent's prohibition from contact with a child pursuant to a protection from abuse order or other court order, should not, standing alone, constitute abandonment. *See Adoption of Hali D.,* 2009 ME 70, ¶ 2, 974 A.2d 916, 917; *see also In re Baby Duncan,* 2009 ME 85, ¶ 11, 976 A.2d 935, 939. However, like an incarcerated parent, such a parent is obligated, due to "the separation caused by" the orders, to make "an even greater effort to foster a nurturing relationship" with the child "using the means available" if he or she wants to maintain a parental relationship with the child. *In re Baby Duncan,* 2009 ME 85, ¶ 11, 976 A.2d at 939 (quotation marks omitted); *Adoption of Hali D.,* 2009 ME 70, ¶ 2, 974 A.2d at 917.

[¶ 22] This analysis is consistent with decisions of other jurisdictions that have considered matters factually similar to the instant case now on appeal. In *In re Sheena B.,* 139 N.H. 179, 651 A.2d 7, 11–12 (1994), the father's parental rights were terminated by the trial court due to abandonment for at least six months during a period when the father was prohibited by a restraining order from contacting the child. Vacating, the court held that, considering the totality of the evidence—including the fact that the father consulted an attorney to seek visitation despite the restraining order, filed a petition seeking visitation, and otherwise took steps to evi-

dence an intent to parent the child—the evidence was insufficient to demonstrate an intent to abandon the child for purposes of termination of parental rights. *Id.* at 9–12. The court observed, however, that if a parent engages in voluntary conduct that he "knew, or should have known, would necessarily and inexorably lead to the loss of opportunity to see his child, then one could find that this conduct—and hence the resulting lack of contact with the child—manifested an intent on the part of the [parent] to abandon the child." *Id.* at 11.[3]

[¶ 23] Here, although the father faced court-ordered impediments to the development of a relationship with Lily, he made no effort to develop any relationship with her, to contact her, or to otherwise demonstrate an intent to parent her "using the means available" to him.

[¶ 24] First, the father made no effort to contact or demonstrate an intent to parent the child before entry of the protection from abuse orders. Thereafter, despite being personally served with the various complaints, summonses, hearing notices, and information outlining his rights, the father never responded, opposed, or made an appearance when notified of the complaint, entry, and extension of the protection from abuse order and the petition for determination of parental rights and responsibilities. He never attempted to modify the orders for the purpose of permitting him to legally contact the child or to develop any relationship with her.[4]

[¶ 25] Second, contrary to his argument that he refrained from contacting Lily as a result of compliance with court orders, he violated the protection from abuse orders multiple times by contacting the mother. In those contacts he never asked about Lily, asked for a photograph, inquired into her health, activities, or education, and never attempted to send the child a card or gift.

[¶ 26] Third, the evidence indicates that the father made no effort to establish a relationship with the child by means that did not require contact with her, such as by actively seeking to provide child support, having his own family contact Lily to establish a relationship, contacting the mother's attorney, or contacting the mother directly to inquire about the child after the protection from abuse order expired.

3. *See also In the Interest of D.J.R.,* 454 N.W.2d 838, 841–42 (Iowa 1990) (affirming termination of parental rights on grounds of abandonment when the parent failed to pursue a relationship with the child to the extent allowed by a no-contact order that permitted contact only in a therapeutic setting); *In re Interest of Dustin H.,* 259 Neb. 166, 608 N.W.2d 580, 584–86 (2000) (affirming termination of the mother's parental rights due to abandonment of the children for at least six months immediately before the filing of the petition to terminate, even though a court order granting the mother no rights of visitation was in effect for a portion of this six-month period, because the mother did not show any interest in her children or make an effort to maintain a relationship with them in other ways available to her); *In re Interest of B.J.M.,* 1 Neb.App. 851, 510 N.W.2d 418, 422, 425–26 (1993) (reversing termination of parental rights on grounds of abandonment where the father was subject for a portion of the relevant time to a no-visitation order with the children, but where the father took steps—including contacting DSS numerous times to attempt to arrange visitation with the children, opposing the motion to limit his visitation, seeking reconsideration of the no-visitation order, moving to the state where the children lived, and persisting in his genuine efforts to work with DSS—that demonstrated an interest in his children despite the court-ordered impediment to his establishing an actual relationship with the children).

4. There is no evidence in the record that the father's military service contributed to his failure to evidence an intent to parent the child.

[¶ 27] Fourth, the only financial support the father has provided on Lily's behalf consisted of certain "mandated" payments which were withheld from his military pay and tax refunds to reimburse the State.

[¶ 28] Finally, the father testified that he "chose myself I would stay away until a situation like [the termination of parental rights hearing] came up, because every time I did there would be a restraining order and I just didn't want to deal with it" and that, "[a]fter March 2007, I was going to stay away permanently until the situation like this arose this year." This testimony shows his "intent to forego parental duties or relinquish parental claims." 22 M.R.S. § 4002(1–A)(F).

[¶ 29] The father offers several arguments in support of his position that are unpersuasive. First, contrary to the father's contention, his opposition to the termination of the parental rights action does not, by itself, avoid a finding, by clear and convincing evidence, of abandonment. *See In re Baby Duncan*, 2009 ME 85, ¶ 12, 976 A.2d at 939; *In re Brianna K.*, 675 A.2d 980, 982 (Me.1996) ("A 'mere flicker of interest' is not sufficient to bar a finding of abandonment.").[5]

[¶ 30] Second, the Probate Court did not, in effect, order the termination of his parental rights based on a "preponderance of the evidence" standard by finding that the father had abandoned the child as a result of his compliance with protection from abuse orders, which were entered based on a preponderance of the evidence standard. The court properly determined that, because of the existence of the orders prohibiting contact with the child, the father, like an incarcerated parent, needed

to make a greater effort to foster a relationship with Lily, finding by clear and convincing evidence that he did not do so.

[¶ 31] Third, contrary to the father's contention that the mother prevented him from establishing a relationship with Lily by keeping her address confidential and by failing to seek child support from him: (1) he periodically had Lily's contact information as evidenced by his contacting the mother; (2) he had the mother's attorney's contact information since 2005; (3) he made no effort to voluntarily provide child support; and (4) in a letter he sent to the mother, he not only stated that he had the mother's contact information and had lost it, but he said that he was concealing his own contact information from the mother.

[¶ 32] The court's finding of abandonment is fully supported in the record.

**B. Unwillingness or Inability to Take Responsibility for the Child**

[¶ 33] Relying on *In re John Joseph V.*, 500 A.2d 628, 630 (Me.1985), the father argues that the court's findings that he has no relationship with the child and has never taken responsibility for Lily do not support the determination, by clear and convincing evidence, that he is unwilling or unable to take responsibility for the child, particularly when the father testified that he is now employed and would like to pay child support. The father also argues that the court erred by placing the burden on him to demonstrate by clear and convincing evidence that he had the ability to take responsibility for Lily rather than placing the burden on the mother to show otherwise.

5. The father's discussion of payment of mandated child support in two letters to the mother and his fleeting demonstration of intent to comply with the State's request that he provide healthcare support for Lily does not,

arguably, demonstrate even a flicker of interest, given that he was merely responding to State requirements and, apparently, failed to follow through with healthcare coverage.

[¶ 34] In *In re John Joseph V.*, we concluded that the record did not contain clear and convincing evidence that the father was unable to take responsibility for the child because, even though the record showed that the father was neglectful in paying child support and in maintaining contact with the child, the mother also "purposefully resolved to close all avenues of contact" between the father and child. 500 A.2d at 630. However, in that case, the father regularly paid child support until he was denied contact with the child and much of the evidence in the case went to the "best interests of the child" inquiry rather than the "inability to take responsibility" inquiry. *Id.* Furthermore, the father in that case lived or visited with the child for the first four-plus years of the child's life, had visitation rights following his divorce from the child's mother, and traveled to Maine in an effort to locate the child when the mother made it difficult for him to contact the child. *Id.* at 629. These facts distinguish *In re John Joseph V.* from the case now before us.

[¶ 35] The Probate Court found that "there was no testimony as to how [the father] would meet Lily's needs" and that "[h]e did not propose a plan for accommodating her." The court also found that the father has no relationship with the child, has never seen or spoken to her, has sent her no cards or gifts, has never inquired into her school or activities, and has never taken responsibility for her health or welfare. These facts constitute clear and convincing evidence upon which the court based its conclusion that the father has been unwilling or unable to take responsibility for Lily within a time that is reasonably calculated to meet the child's needs.

## C. Best Interest of the Child

[¶ 36] The father argues that the court's finding that Lily's educational, medical, and financial needs are being met by the mother and the stepfather is conclusory and lacks sufficient support in the record. He argues that, as in *In re Brandon D.*, 2004 ME 98, ¶¶ 13–14, 854 A.2d at 232, there is no evidence that the child would suffer if the father's parental rights are not terminated, noting that Lily's interest was not represented at the hearing because no guardian ad litem had been appointed.

[¶ 37] In determining whether termination is in the child's best interest, a court must consider "many factors, including the needs of the child, the child's age, attachment to relatives, periods of attachment and separation, the child's ability to integrate into a substitute placement or back into his parents' home, and the child's physical and emotional needs." *In re Jacob B.*, 2008 ME 168, ¶ 14, 959 A.2d at 738.[6] Also relevant is the parent's failure to pay child support, the parent's lack of contact with the child, and the child's need for permanence and stability. *Id.*

[¶ 38] Lily was six years old at the time of the termination hearing. She lives in a stable, permanent family situation with her mother, her stepfather, and a younger sister. Lily calls her stepfather "Dad" and is confused by any reference to

---

6. As the father contends, we indicated in *In re Brandon D.*, 2004 ME 98, ¶ 13, 854 A.2d 228, 232, that it is relevant to the best interests inquiry if the record fails to show that the child, doing well in his current placement, would suffer harm, or that his current living situation would change, if the father's parental rights are not terminated. However, we did not vacate the judgment terminating the father's parental rights on that basis alone. We concluded that the record failed to contain sufficient evidence of any kind, including evidence of the needs of the children, that termination of the father's parental rights was in the children's best interests; that the court's findings were incomplete; and that we could not give the usual deference to those findings. *Id.* ¶¶ 12–15, 854 A.2d at 231–32.

another father whom she has never met or heard from. The stepfather loves Lily, considers her his daughter, and has been the only father-figure she has known since she was an infant. Contrary to the father's contention, the record contains evidence of a clear and convincing quality that Lily's mother and stepfather have been able to meet all of her financial, physical, and emotional needs.

[¶ 39] The record does not expressly address the harms that Lily could suffer if the father's parental rights are not terminated. However, the record supports the court's concern that the father has not adequately, or ever, addressed his admitted drug abuse and domestic violence issues. Further, as we have recently stated, "the best interest standard looks to many factors that affect the best interests of the child—it is not limited to whether or not there is affirmative evidence that contact with an absent parent will be harmful to the child." *Id.* ¶¶ 12, 17, 19, 959 A.2d at 737, 738, 739.

[¶ 40] The record contains clear and convincing evidence to support the court's determination that termination of the father's parental rights is in the child's best interest.

The entry is:

Judgment affirmed.