2012 ME 45

### ADOPTION OF TOBIAS D.

Supreme Judicial Court of Maine.

Argued: Dec. 12, 2011.

Decided: March 29, 2012.

Rosemarie Giosia, Esq. (orally), Ellsworth, for appellant R.M.

Amy Faircloth, Esq. (orally), Pelletier & Faircloth, Bangor, for appellee guardians.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

GORMAN, J.

[¶ 1]   R.M. appeals from a judgment entered in the Hancock County Probate Court (*Patterson, J.*) denying his petition to establish his parental rights to Tobias D. and granting the petition of the child's current guardians to terminate his parental rights to the child.   R.M. argues that the court erred in failing to find that he is the child's legal father, in determining that he is not entitled to parental rights pursuant to 18–A M.R.S. § 9–201 (2011), and in terminating his parental rights pursuant to

18–A M.R.S. § 9–204 (2011). He also challenges the constitutionality of section 9–201, and the court's reliance on the testimony of a particular witness. We vacate the judgment.

## I. BACKGROUND

[¶ 2] Tobias was born in September of 2009. His mother, who was living in Indiana, was sexually active with multiple men around the time of the child's conception, including (1) her husband, who is not the child's father according to a DNA test; (2) R.M.; and (3) a man she could identify only as "Jose." At some point during her pregnancy, the mother informed R.M. that she was pregnant, he might be the father, and she was planning to terminate the pregnancy; the mother later informed R.M.'s aunt that she had had an abortion, and R.M. believed that to be true.

[¶ 3] Unbeknownst to R.M., however, the mother had informally arranged for the child to be adopted by a family friend

and the friend's husband (the guardians) in Maine. The mother gave birth to the child in Maine and left the child with the guardians a few days after giving birth. The child, now two and one-half years old, has resided with the guardians since then.

[¶ 4] The guardians filed three petitions in the Probate Court on November 9, 2009: a petition to adopt the child, a petition for guardianship of the child, and a petition for temporary guardianship of the child.[1] With the petitions for guardianship, the mother submitted a "Consent and Affidavit" dated October 22, 2009, and a separate undated affidavit, both listing the identity of the child's father as "unknown."[2] With the adoption petition, the mother submitted another affidavit of paternity dated October 22, 2009, naming the child's father as "[n]ot known."[3] On December 22, 2009, the mother submitted a second affidavit in the adoption matter, again naming the father as "unknown." By order dated December 22, 2009, the

---

1. Pursuant to 18–A M.R.S. § 9–310 (2011), "all Probate Court records relating to any adoption decreed on or after August 8, 1953 are confidential." In an apparent effort to comply with this provision, the Probate Court established separate files, with separate docket numbers, for the guardians' petition for guardianship and their petition for adoption. Although section 9–310 does permit the Probate Court to authorize examination of the records by authorized persons, the Probate Court denied a request from R.M.'s counsel for copies of the actual documents filed by the guardians in support of their petition for adoption. R.M.'s counsel did receive a redacted copy of the docket sheet from the adoption record, along with the documents in that file that the court deemed related to the petition to terminate his parental rights and his own petition to establish parental rights.

2. Various documents in the adoption file, including the petition for adoption and name change, the proposed certificate of adoption, and the child's certificate of live birth, list the mother's husband as the child's "[l]egal" father. The mother's husband filed with the

court a "Waiver of Notice by Putative Father or by Legal Father (Who is Not the Biological Father)" on November 24, 2009.

3. The mother stated in two of these affidavits, "I had sexual relations with many men ... [and] have no way to ascertain the identity or whereabouts of the biological father." Based on this second affidavit, the petitioners moved to allow notice of the pending adoption to be accomplished through publication. The court denied this motion. The file contains no indication that any attempt at service by any means was ever attempted or accomplished, notwithstanding the provision in 18–A M.R.S. § 9–201(b) (2011) for just such a circumstance:

> If the biological mother does not know or refuses to tell the court who the biological father is, the court may order publication in accordance with the Maine Rules of Probate Procedure in a newspaper of general circulation in the area where the petition is filed, where the biological mother became pregnant or where the putative father is most likely to be located.

court appointed the mother's friend and the friend's husband as the child's limited temporary legal guardians.

[¶ 5] Despite these four affidavits, however, and apparently based solely on the child's appearance at the time of his birth, the mother had concluded that R.M. was, in fact, the child's father. By letter dated January 8, 2010, the mother informed R.M. that in fact she had given birth to the child and that he was the father.

[¶ 6] On January 11, 2010, the guardians filed a letter with the Probate Court advising it that "we now know that the biological father of [the child] is [R.M.]" Nine days later, they filed a motion requesting that the court order Maine's Department of Health and Human Services to request from the State of Indiana an assessment of R.M. and the mother to determine the suitability of placing the child with either of them pursuant to the Interstate Compact for the Placement of Children, 22 M.R.S. §§ 4251–4269 (2011). They also requested that the court appoint a guardian ad litem for the child. On January 28, 2010, R.M. filed a request for a change of guardianship and an objection to the adoption petition. On the same date, the guardians petitioned for termination of R.M.'s parental rights. On February 1, 2010, R.M.'s parents also filed a request for change of guardianship and an objection to the adoption. The following day, the mother filed two additional affidavits of paternity in the adoption matter, and two additional affidavits in the guardianship matter, this time naming R.M. as the father. On February 26, 2010, R.M. filed a voluntary acknowledgement of paternity.[4]

[¶ 7] The Probate Court assigned counsel to R.M. in May of 2010 and, after a significant amount of process and discovery, R.M. petitioned the court for parental rights in October of 2010. In December of 2010, the court appointed an attorney—with the powers and duties of a guardian ad litem—to represent the child. See 18–A M.R.S. § 5–407(a) (2011).

[¶ 8] The court conducted a hearing in January of 2011 on R.M.'s petition to establish parental rights and the guardians' petition to terminate R.M.'s parental rights. By judgment dated March 23, 2011, the court found that "for purposes of these proceedings, [R.M.] shall be considered to be [the child's] biological father," but denied R.M. parental rights after concluding that R.M. both "failed to carry his burden of proving that he is able to take responsibility for [the child] within a time reasonably calculated to meet this child's needs" and failed to establish that "a declaration of his parental rights will be in [the child's] best interest." The court granted the guardians' petition to terminate his parental rights pursuant to 18–A M.R.S. § 9–204 for the same reasons. R.M. appeals.

## II. DISCUSSION

### A. Paternity

[¶ 9] We have consistently recognized that a biological parent has a fundamental liberty interest in parenting his child absent a showing of unfitness. E.g., Guardianship of Jewel M., 2010 ME 80, ¶ 6, 2 A.3d 301. Indeed, the parties in this matter have focused on the court's fitness determination and whether the process afforded R.M. adequately protected that fundamental right to parent.

[¶ 10] Nevertheless, neither R.M.'s fitness as a parent nor the process due to him as a parent is implicated if he is not, in

4. The court filed and docketed R.M.'s voluntary acknowledgement of paternity with the guardianship record, which may explain the Probate Court's failure to reference it in considering the pending petitions in the adoption case.

fact, the child's biological father. The paternity provision of the adoption statute, 18–A M.R.S. § 9–201, provides that the court may grant parental rights only to a putative father who is, in fact, the biological father of a child whose mother has placed him or her for adoption.[5] 18–A M.R.S. § 9–201(i). Likewise, the court need not even consider whether to terminate R.M.'s rights before proceeding with the adoption if he is not the father of the child. *See* 18–A M.R.S. §§ 9–204, 9–302(b) (2011). The importance of R.M.'s paternity to the disposition of this case therefore cannot be overstated.

[¶ 11] Unfortunately for all of the parties involved, however, the record introduces substantial doubt as to whether R.M. is, in fact, the child's biological father.[6] These proceedings began in November of 2009. The mother originally attested four times under oath that she did not know the identity of the child's father. Later, she based her conclusion that R.M. is the father solely on the child's appearance. The mother also concedes that it is possible that some other man is the father. In January of 2010, the child's mother first disclosed to both R.M. and the Probate Court that R.M. was the child's father. Almost immediately, R.M. acknowledged his paternity.[7] At that point, the Probate Court immediately should have ordered R.M. to participate in paternity testing.[8] *See* 18–A M.R.S. § 1–302(b) (2011) ("The [Probate] Court has full power to . . . take all other action necessary and proper to administer justice in the matters which come before it."); *Estate of Kingsbury,* 2008 ME 79, ¶ 9, 946 A.2d 389 (holding that 18–A M.R.S. § 1–302(b) provides the court with authority to order DNA testing when there exists "good cause or sufficient reason").

[¶ 12] In its very first incarnation, the paternity provision of the adoption statute was enacted in 1855. R.S. ch. 189, § 5 (1855). More than a century and a half has passed, however, and DNA tests are now accessible, easily administered, affordable, and routinely used to determine actual parentage. A child's physical appearance is no longer determinative or even relevant. When the paternity of a child is in question, science, rather than anecdote, should prevail, and the parties should be required to submit to DNA testing. *See State v. Paradis,* 2010 ME 141, ¶ 6, 10 A.3d 695 (referencing the immutability of biological parenthood).

[¶ 13] Given the uncertainty created by the record in this case, we conclude that, without a paternity test, the court lacked competent evidence to support its finding that R.M. is the child's biological father.

5. Jurisdiction to consider R.M.'s paternity was vested in the Probate Court only for purposes of the adoption proceedings, and could not have been properly determined for guardianship purposes. *See* 18–A M.R.S. § 9–201 (2011). Outside the context of an adoption, paternity jurisdiction lies with the District Court. 19–A M.R.S. § 1556 (2011).

6. The court's judgment even notes: "In the absence of a test using a blood or DNA sample from [R.M.] and [the child], I cannot eliminate the possibility that [the child] could be Jose's son and that this question may not be settled, regardless of my decisions today. Nonetheless I will proceed to decide these petitions."

7. We express no opinion regarding the efficacy of R.M.'s voluntary acknowledgement of paternity, filed on February 26, 2010, by itself or combined with the mother's third affidavit of paternity listing R.M. as the child's father. *See* 19–A M.R.S. §§ 1614, 1616, 3016 (2011) and 22 M.R.S. § 2761(4) (2011). At this point, given the unique circumstances of this case, the uncertainty as to this child's paternity cannot be overcome simply by mutual agreement between the mother and R.M. that R.M. is the child's father.

8. The statutory provisions for DNA testing for paternity actions in the District Court may provide some helpful guidelines. *See* 19–A M.R.S. §§ 1558–1559 (2011).

We vacate the court's determination that R.M. is the child's biological father and remand the matter for the court to order DNA testing at the earliest possible time.

### B. Parental Rights

[¶ 14] Although we are mindful of the very real risk that this litigation may become moot after paternity testing, we also take this opportunity to clarify 18–A M.R.S. § 9–201 to provide the court and the parties with the guidance necessary to evaluate such petitions in the future.

Section 9–201 provides, in pertinent part:

(a) When the biological mother of a child born out of wedlock wishes to consent to the adoption of the child or to execute a surrender and release for the purpose of adoption of the child and the putative father has not consented to the adoption of the child or joined in a surrender and release for the purpose of adoption of the child or waived his right to notice, the biological mother must file an affidavit of paternity with the judge of probate so that the judge may determine how to give notice of the proceedings to the putative father of the child.

. . . .

(d) If, after notice, the putative father of the child wishes to establish parental rights to the child, he must, within 20 days after notice has been given or within a longer period of time as ordered by the judge, petition the judge of probate to grant to him parental rights. The petition must include an allegation that the putative father is in fact the biological father of the child.

(e) Upon receipt of a petition under subsection (d), the judge shall fix a date for a hearing to determine the putative father's parental rights to the child.

. . . .

(i) If, after a hearing, the judge finds that the putative father is the biological father, that he is willing and able to protect the child from jeopardy and has not abandoned the child, that he is willing and able to take responsibility for the child and that it is in the best interests of the child, then the judge shall declare the putative father the child's parent with all the attendant rights and responsibilities.

(j) *If the judge of probate finds that the putative father of the child has not petitioned or appeared within the period required by this section or has not met the requirements of subsection (i)*, the judge shall rule that the putative father has no parental rights and that only the biological mother of the child need consent to adoption or a surrender and release.

18–A M.R.S. § 9–201 (emphasis added).

[¶ 15] Section 9–201(j) contains the only language purporting to discuss which party has the burden of proving or disproving a father's fitness in determining whether he has a say in his child's adoption, but that provision cannot be read in a vacuum. Even a plain language reading of a statute requires us to consider the provision at issue in light of the entire relevant statutory scheme. *E.g., Lyle v. Mangar*, 2011 ME 129, ¶ 11, 36 A.3d 867. Multiple provisions must also be read to provide a cohesive result. *Town of Eagle Lake v. Comm'r, Dep't of Educ.*, 2003 ME 37, ¶ 10, 818 A.2d 1034 (stating that when two statutory provisions appear inconsistent, "the correct interpretation is one that reasonably reconciles the two statutes in light of their legislative purpose"). Any interpretation that produces "absurd, illogical or inconsistent results" must be rejected. *Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 10, 17 A.3d 667 (quotation marks omitted).

[¶ 16] A denial of a father's parental rights pursuant to section 9–201

effects a termination of his parental rights. A termination of parental rights, however, may only be accomplished according to 22 M.R.S. § 4055 (2011), which allows the court to terminate parental rights when:

(1) The parent consents to the termination. Consent shall be written and voluntarily and knowingly executed in court before a judge. The judge shall explain the effects of a termination order; or

(2) The court finds, based on clear and convincing evidence, that:

(a) Termination is in the best interest of the child; and

(b) Either:

(i) The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs;

(ii) The parent has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs;

(iii) The child has been abandoned; or

(iv) The parent has failed to make a good faith effort to rehabilitate and reunify with the child pursuant to section 4041.

22 M.R.S. § 4055(B). It is the petitioner's burden to establish both parental unfitness and best interest by clear and convincing evidence. *In re Alana S.*, 2002 ME 126, ¶ 15, 802 A.2d 976. Further, the court may not even contemplate the child's best interest until it has found at least one ground of parental unfitness. *Id.*

[¶ 17] Through many years of interpretation, we have concluded that the procedures, burdens, and standards set out in section 4055 constitute the means by which the fundamental constitutional right to parent is safeguarded. *See, e.g., In re Robert S.*, 2009 ME 18, ¶¶ 12–16, 966 A.2d 894 (holding that the procedure outlined in title 22 preserves a parent's right of procedural due process); *In re Crystal S.*, 483 A.2d 1210, 1213 (Me.1984) (concluding that the clear and convincing standard of proof required for termination of parental rights is constitutional). There is no reason to set aside these rigorous requirements for another interpretation simply because the termination is accomplished by private parties in the context of an adoption. Such a distinction is not supportable pursuant to our standards for interpreting statutes, and is contrary to our express holding that "[i]n considering a petition to terminate parental rights in conjunction with an adoption proceeding, the Probate Court is governed by 22 M.R.S.A. §§ 4051–4057." *In re Peter M.*, 602 A.2d 1161, 1163 (Me.1992).

[¶ 18] Indeed, even within the Probate Code, the court is directed to apply the requirements of title 22 to termination matters. Title 18–A M.R.S. § 9–204 conveys jurisdiction to the Probate Court to decide some termination petitions initiated by private parties. In considering such private petitions, however, section 9–204 expressly directs the Probate Court to apply "the provisions of Title 22, chapter 1071, subchapter VI." 18–A M.R.S. § 9–204(b). Title 22, chapter 1071 is the Child and Family Services and Child Protection Act, and subchapter VI contains the termination of parental rights provisions, including section 4055.

[¶ 19] In the matter of *In re Caroline M.*, for example, a grandmother sought termination of the parental rights of her daughter, who was the mother of the child at issue, by filing a petition in the Probate Court. 576 A.2d 743, 743 (Me.1990). This Court concluded that the Probate Court properly applied section 4055 to the petition, and that the grandmother failed to meet her burden as the petitioner pursu-

ant to section 4055. *Id.* at 745; *see also In re Shulikov*, 2000 ME 70, ¶¶ 5, 15, 749 A.2d 1270 (applying title 22 to a termination petition filed in conjunction with an adoption petition in the Probate Court); *In re Peter M.*, 602 A.2d at 1163 (same); *In re Shane T.*, 544 A.2d 1295, 1296 n. 2, 1298 (Me.1988) (same).

[¶ 20] Correctly applying section 4055 to the present matter places the burden on the guardians to first establish at least one ground of R.M.'s parental unfitness by clear and convincing evidence. We appreciate that the Probate Court's confusion in this area may be due, in no small part, to our recent decision in *In re Baby Duncan*, 2009 ME 85, 976 A.2d 935. In that case, we evaluated a couple's attempt to adopt a child whose biological mother had consented to the adoption, and whose biological father was incarcerated for at least eight, and up to twenty, years. *In re Baby Duncan*, 2009 ME 85, ¶¶ 2, 4, 976 A.2d 935. The biological father acknowledged that he could not immediately provide for his child, but proposed that the child be placed with his own parents during his incarceration. *Id.* ¶¶ 4–5. We held that the court properly denied the father's petition to establish parental rights pursuant to 18–A M.R.S. § 9–201. *Id.* ¶¶ 8, 17. In doing so, we twice referred to the father's failure to establish his parental fitness. *Id.* ¶¶ 12, 14 n. 4. We also stated that parental rights could be denied based solely on a consideration of the child's best interests. *Id.* ¶ 14.

[¶ 21] Our language in *In re Baby Duncan* was both overbroad and inaccu-rate. It was overbroad because we were not comparing adoptive parents with a biological parent, as in the present matter, but instead were comparing adoptive parents with other potential caretakers who did not have, and were not asserting, any fundamental right to parent the child. In that case, the biological father essentially conceded his inability to parent the child, and the only remaining issue was the best interest of the child. *Id.* ¶¶ 4, 8, 10, 15. The parties in *In re Baby Duncan* never made any argument as to the application of 22 M.R.S. § 4055 to 18–A M.R.S. § 9–201. The decision in *In re Baby Duncan* was based on the unique circumstances it presented, and should not be regarded as applicable to the type of contest presented here. In addition, to the extent *In re Baby Duncan* suggests that a termination of parental rights may be accomplished based solely on the best interest of the child, the language was inaccurate and in error, and we overrule that portion of the decision.[9]

[¶ 22] In considering R.M.'s fitness as a parent, the court primarily relied on R.M.'s financial situation as well as his "immatur[ity]" to conclude that R.M. is not able to care for the child.[10] As a matter of law, however, these factors were not a proper basis to find R.M. an unfit parent. Socioeconomic status or a finding that a parent is less financially stable than potential guardians is not the type of finding that renders a parent unfit as a matter of law unless it is also determined that he is unable or unwilling to ensure that the

9. The Court in *In re Baby Duncan*, 2009 ME 85, ¶ 14, 976 A.2d 935, relied in part on the prior decision of *Adoption of G.*, 529 A.2d 809 (Me.1987). Although this Court held in *Adoption of G.* that a best interest determination alone could support the denial of parental rights in the context of an adoption, that conclusion, too, was a misreading of the version of the adoption statute then in effect.

529 A.2d at 812. We therefore also overrule that portion of *Adoption of G.*

10. Specifically, the court noted the amount of income R.M. earns as a mason, the amount of money in his bank account, and the fact that he lives with his parents as support for the conclusion that R.M. is unable to financially support the child.

child's basic needs are met. A parent's fitness is usually called into question due to a serious issue that bears directly on his or her ability to adequately parent the child, such as physical abuse or neglect, *see In re Matthew W.*, 2006 ME 67, ¶ 3, 903 A.2d 333; sexual abuse, *see In re Shulikov*, 2000 ME 70, ¶¶ 1–3, 749 A.2d 1270; substance abuse, *see In re Alivia B.*, 2010 ME 112, ¶ 2, 8 A.3d 625; emotional abuse and significant mental health problems, *see In re Robert S.*, 2009 ME 18, ¶ 4, 966 A.2d 894; a proven inability to care for a child with special needs, *see In re Michaela C.*, 2002 ME 159, ¶ 21, 809 A.2d 1245; or a history of domestic violence, *see Adoption of Lily T.*, 2010 ME 58, ¶¶ 3–4, 997 A.2d 722. Finances should not form the foundation of a court's fitness determination, and the court's reliance on them here was error.

[¶ 23] A parent's fitness also must be evaluated in the context of all relevant circumstances. This is not a case in which a person who has had the opportunity to parent a child has failed to do so adequately. Rather, as the Probate Court correctly emphasized in its order, R.M. has been precluded from developing any relationship with this child; in fact, he was completely unaware of this child's existence for the first four months of the child's life. Since learning of the child's existence, R.M. consistently has made efforts, albeit unsuccessfully, to contact and develop a relationship with him.

[¶ 24] In this respect, R.M. is not unlike the father in *In re Cody T.*, 2009 ME 95, 979 A.2d 81. In the context of a termination proceeding in *In re Cody T.*, we held that the father's lack of an opportunity to form a relationship with the child precluded a finding by clear and convincing evidence that the father was unfit or unable to "provide a nurturing parental relationship with his child once the relationship with the child can be re-established." *In re Cody T.*, 2009 ME 95, ¶¶ 29, 31, 979 A.2d 81. The record with regard to R.M.'s potential to take responsibility for the child is equally lacking, and the deficit is similarly no fault of his own.

## C. Conclusion

[¶ 25] Given the ambiguity of the child's actual parentage, we must vacate the court's judgment denying and terminating R.M.'s parental rights in its entirety, and we remand the matter to the Probate Court for entry of an order requiring DNA testing.[11] If the DNA test results establish that R.M. is not the father, R.M. lacks standing to proceed in the matter and the guardians are free to continue with their efforts to adopt Tobias. *See Philbrook v. Theriault*, 2008 ME 152, ¶ 19, 957 A.2d 74 (defining standing to obtain custody of or visitation with a child with reference to biological parenthood). If, as the Probate Court assumed, R.M. is the child's biological father, the Probate Court will have to decide R.M.'s petition to establish parental rights and the guardians' petition to terminate R.M.'s parental rights in accordance with this opinion.

[¶ 26] In the latter event, the court must also immediately reconsider the guardianship it ordered in 2009.[12] A

---

11. Because we vacate the court's judgment, we need not consider R.M.'s alternative arguments, that section 9–201 is unconstitutional and that the court erred in considering the testimony of a particular witness. *See Rideout v. Riendeau*, 2000 ME 198, ¶ 15, 761 A.2d 291 (adopting the view that we should not "anticipate a question of constitutional law in advance of the necessity of deciding it" (quotation marks omitted)).

12. In fact, the court already could have terminated the guardianship. The mother represented in her first four affidavits that the child's father was unknown. There is now no dispute that she believed R.M. to be the father, and informed him and the court of that

guardianship may be granted only when: (1) both parents' parental rights have already been terminated or suspended, 18–A M.R.S. § 5–204(a) (2011); (2) each parent whose rights have not been terminated consents to the guardianship, 18–A M.R.S. § 5–204(b) (2011); (3) a parent whose rights have not been terminated and who does not consent fails to respond to proper notice of the proceedings, 18–A M.R.S. § 5–204(c) (2011); (4) the child is in an intolerable living situation that does not rise to the level of jeopardy, 18–A M.R.S. § 5–204(c); or (5) there is a de facto guardian, as well as a parent whose rights have not been terminated, who does not consent, and who lacks "consistent participation" with the child, 18–A M.R.S. § 5–204(d) (2011). If DNA testing demonstrates that R.M. is the child's father, the Probate Court will again have to consider whether any of these five circumstances is supported as it grapples with the competing demands for this child.

[¶ 27] We recognize, of course, that if R.M. is indeed the child's father, and is not found to be an unfit parent according to the analysis we now provide, the process of removing the child from the only home he has ever known will be a difficult and painful one for all involved. Title 18–A M.R.S. § 5–213 (2011) allows the Probate Court to fashion "transitional arrangements" for the child, such as providing for rights of contact, counseling, rehabilitation, etc., and we encourage the Probate Court to determine the best way to introduce the child to his father.

[¶ 28] Because time is paramount in these developmentally crucial years of the child's life, the court should strive to obtain the DNA results, and to resolve the matter accordingly, as expeditiously as possible.

The entry is:

Judgment vacated. Remanded to the Probate Court for further proceedings consistent with this opinion.

---

fact just weeks after filing her affidavit. When, in January of 2010, the court realized that the father had been identified, it could have terminated the guardianship because it was based on the fraud or misrepresentation of the mother. *See* 18–A M.R.S. § 5–204; M.R. Civ. P. 60(b)(3); *Presnell v. Peoples Heritage Bank,* 619 A.2d 1205, 1206 (Me.1993) (recognizing the court's inherent sua sponte powers in certain circumstances to allow it to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases" in the "furtherance of justice" (quotation marks omitted)).

Indeed, the guardianship may no longer exist in any event. Title 18–A M.R.S. § 5–207(c) (2011) states that "the authority of a temporary guardian may not last longer than 6 months" with some exceptions not applicable here.